GENERAL WAREHOUSEMEN AND EMPLOYEES UNION LOCAL NO. 636, Plaintiff,

v.

J. C. PENNEY COMPANY, Defendant.

Civ. A. No. 79–531.

United States District Court, W. D. Pennsylvania.

Jan. 31, 1980.

Joseph J. Pass, Jr., Jubelirer, Pass & Intrieri, Pittsburgh, Pa., for plaintiff.

Walter G. Bleil, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant.

## OPINION

SNYDER, District Judge.

General Warehousemen and Employees Union Local No. 636 (Union), affiliated with the International Brotherhood of Teamsters, brought action under Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, to compel J. C. Penney Company (Company) to arbitrate the discharge of an employee. The matter was heard to the Court. We find no con- tractual obligation to arbitrate grievances existed at the time of the discharge, and will deny the petition to compel arbitration. The following shall constitute the Court's findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

### I.

On May 29, 1974, the Company and the Union entered into a collective bargaining agreement (1974–1975 Agreement) covering wages, hours and conditions of employment for the employees at the Company's North Versailles facility. The contract contained grievance and arbitration provisions,[1] and expired on April 30, 1975. In the days and weeks preceding the expiration date, the Union and the Company were negotiating the terms of a new collective bargaining agreement when it became obvious to both sides that a new contract would not be reached by April 30, 1975. At the April 21, 1975 bargaining session, Joseph Mardell, a member of the Union's Bargaining Committee, asked the Company's Attorney and Chief Negotiator, William Wollett, what the Company's position would be during the post-contract hiatus;. the Union, Mardell said, was willing to work while bargaining continued. Mardell understood Wollett to say that all the terms and conditions of the old contract would continue, and this was the message he conveyed to the Union membership. We find that Wollett said the Company would continue to bargain in good faith over the terms and conditions of the contract and would not make unilateral changes in the terms and conditions of employment unless the parties had bargained to an impasse. This did not occur. Wollett

---

1. The contract provided, *inter alia*, for a four-step grievance procedure culminating in binding arbitration: step one, aggrieved employee, with or without union steward, attempts to resolve dispute with his immediate supervisor; step two, union steward presents written grievance to Distribution Manager; step three, representative of the Local may appeal to the Regional Personnel Relations Representative of the Company; step four, binding arbitration. Any dispute as to the meaning and application of the express provisions of the contract would be settled through this grievance procedure. A grievance, by definition, was a dispute or claim arising "under and during the term of the Agreement." The contract also contained an express no strike clause.

The Company retained the sole right to discipline and discharge employees for cause, but grievances over discipline and discharges were, of course, within the scope of the contractual grievance procedure, and disciplinary discharge grievance were initiated at step three of the process.

did not elaborate at the meeting on what he meant by "terms and conditions of employment", and he never stated the grievance and arbitration procedure would be extended. The April 30, 1975 deadline passed without a new contract being reached; the employees continued to work and the parties continued their negotiations.

Subsequent to the April meeting, a dispute arose over the Company's transfer of one of its employees, Eileen Slonaker. Wollett, in a letter dated July 31, 1975, stated that the Company was willing to discuss the matter in an attempt to settle it, but refused to arbitrate contending the arbitration procedure had expired. The Union eventually determined the transfer was permitted by the contract and did not then press its asserted right to arbitration.

In August 1975, the Company offered the Union a limited agreement in which a grievance and arbitration procedure, similar to that in the 1974–1975 Agreement, would be in effect, in return for the Union's agreement that there would be no strikes, including economic strikes in furtherance of any demands made during negotiations. The Union, believing this unduly restricted their right to strike for a new contract, if necessary, rejected the offer. Robert Baird, Union Business Agent, stated that since the 1974–1975 Agreement was extended, in the Union's opinion, there was no need for an agreement establishing a grievance procedure. As to the no strike clause in the old contract (which ostensibly was as binding on the Union as that proposed in the limited agreement), Baird contended the old contract was continued on a day-to-day basis only and therefore the Union retained the right to strike in furtherance of its economic demands during the post-contract hiatus, if negotiations reached an impasse.[2]

The next pertinent incident is the one at issue here. On August 10, 1977, the Company discharged Joseph Prince. The Union requested arbitration and the Company refused.

A new collective bargaining agreement was reached on December 6, 1978. Although the Prince matter had been discussed on numerous occasions, the parties were unable to resolve it and both sides agree that the collective bargaining agreement reached December 6, 1978 did not affect it.

## II.

The Union argues that Wollett agreed to extend the 1974–1975 Agreement. They contend that his statements lead only to that one conclusion when reasonably interpreted in light of all the facts and circumstances, and especially since all parties abided by the terms and conditions of the 1974–1975 Agreement during the hiatus.

The Company argues that its offer at the April meeting was to extend the terms and conditions of employment until a new contract was reached, and that arbitration was *not* included. Under *Hilton-Davis Chemical Company*, 185 NLRB 241, 75 LRRM 1036 (1970), they urge, an employer may unilaterally terminate arbitration provisions following expiration of the contract, and, in this sense, it is not a term or condition of employment.[3] Furthermore they contend,

---

2. During negotiations, some mutually agreed upon increases were given in wages and insurance benefits and a portion of the pension plan was changed to bring it into conformity with ERISA. A unilateral change occurred in May 1977, when Joseph Sartoris took over Wollett's position as the Regional Personnel Relations Attorney and Negotiator. Since, in Sartoris' opinion there was no agreement in effect between the Union and the Company, he discontinued the Union dues checkoff and security provisions. The Union did not object, because, in Baird's terms, the matter "was not worth pursuing".

3. In *Hilton-Davis Chemical Company*, 185 NLRB 241, 75 LRRM 1036, 1038 (1970), the court, citing *Kingsport Publishing Corp. v. NLRB*, 6 Cir., 399 F.2d 660, 661, 69 LRRM 2193 (1968), stated:

"'While Congressional policy favors the settlement of labor disputes by the arbitral process rather than by economic warfare, (See Section 203(d) of the Labor Management Relations Act . . .); [*Steelworkers v. American Mfg. Co.*, 363 U.S. [564] 574, [80 S.Ct. 1343, 4 L.Ed.2d 1403] 46 LRRM 2414 (1960)] arbitration nevertheless rests upon a contractual basis. *John Wiley & Sons, Inc. v.*

since the Union refused to give up the right to strike, Wollett never agreed to extend the 1974–1975 Agreement's arbitration procedure, as there was no *quid pro quo.*

### III.

██ The duty to arbitrate is a matter of contract, and before a party can be required to arbitrate any dispute there must be a finding that the parties agreed to arbitrate. *Gateway Coal Co. v. United Mine Workers,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974); *International Union of Operating Engineers, Local 150 v. Flair Builders, Inc.,* 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Congressional policy favors the settlement of labor disputes by the arbitral process rather than by economic warfare, even to the point of resolving doubts over the arbitrability of disputes in favor of arbitrability, *United Steelworkers v. Warrior & Gulf Navigation Co., supra,* but, the question here is whether the parties agreed to extend all the terms and conditions of an expired contract, including the grievance and arbitration procedure.

██ Even though employees continue to work under the compensation arrangements of an old contract, the court cannot imply that the entire contract was extended. As stated in *Proctor and Gamble Independent Union v. Proctor and Gamble Mfg. Co.,* 312 F.2d 181 (2nd Cir. 1962), *cert. denied* 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963):

"We reject appellee's argument that the agreement continued in effect by reason of the action of the parties. On May 13, the employer offered to continue the agreement in effect for another limited period. This offer met with a flat refusal from the union. The fact that the employer chose thereafter not to change many of the working conditions which had prevailed under the expired agreement does not tend in any way to establish that that agreement was, or was considered to be, or was treated as still effective. It is perfectly natural and entirely customary. that, in the short hiatus which is expected to occur between the expiration of one collective agreement and the negotiation of the next, no great change will be made in the existing conditions. Sometimes, as here, a part of the hiatus is covered by an agreed-upon extension of the terms of the expiring agreement. Where no such extension is negotiated, or where the period of the extension has also expired, there is no ground whatever for considering that the old agreement still governs the relationship of the parties." [Footnote omitted]

312 F.2d at 184. *See Garlick Funeral Homes v. Local 100, Service Employees International Union,* 413 F.Supp. 130 (S.D.N.Y.1976). Nor are the checkoff of union dues and the settlement of minor grievances in accord with the old contract, alone, sufficient for the court to infer that the parties agreed to extend the old contract in its entirety. In *Food Handlers, Local 425 v. Arkansas Poultry Cooperative,* 199 F.Supp. 895, 901 (W.D.Ark.1961), *appeal dismissed* 306 F.2d 491 (8th Cir. 1962), Judge Miller cogently stated:

"It is true that the parties had settled · minor grievances, had negotiated the process of arbitration of the present agreement, and had continued the check off of union dues during the period from November 15, 1959, and April 1961. As for the settlement of the minor grievances and the check off of the union dues, there is no indication that these acts were

Livingston, 376 U.S. 543, [84 S.Ct. 909, 11 L.Ed.2d 898] 55 LRRM 2769 (1964) . . .'
Applying these principles to the hiatus which sometimes exists—and existed here—between the expiration of one agreement and the reaching of a new one, it follows that employers and unions must continue to meet and confer and to seek agreement in good

faith, not only over the terms and conditions of a proposed new agreement, but also over employee grievances which may arise during such hiatus. But it does not follow that during such period the law requires the parties to submit to arbitration any grievance which they are unable to resolve."

done in reliance on any existing agreement, but rather were carried on as a routine or customary practice of which there was no compelling reason for either party to alter."

■ Nor can extension of the duty to arbitrate be found from the continuation of wages, for the duty to "meet . . . and confer in good faith with respect to wages, hours and other terms and conditions of employment," established by Sections 8(a)(5) and (d) of the LMRA, 29 U.S.C. §§ 158(a)(5) and (d), prohibits the company from imposing unilateral changes in working conditions during the pendency of negotiations. *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962).

■ We must here determine the interpretation of an offer to continue "[the] terms and conditions of employment". Although the technical rules of contract do not necessarily control all decisions in labor management cases, normal rules of offer and acceptance are determinative of the existence of a bargaining agreement (or in this case, the existence of an agreement to continue the collective bargaining agreement). *F. W. Means & Co. v. NLRB*, 377 F.2d 683 (7th Cir. 1967). It is manifested mutual assent rather than actual mental assent that is the essential element. The test for interpretation of an offer or acceptance is not what the party making it thought it meant, but what his manifestation of agreement was. 1 W. Jaeger, *Williston on Contracts* § 94 (3d ed. 1957); 1 A. Corbin, *Contracts* §§ 106, 107 (1963). An offer is judged by its objective manifestation, not by the subjective interpretations or intentions of the offeror, as is true as well for the acceptance. *Dillon v. AFBIC Development Corp.*, 420 F.Supp. 572 (S.D. Ala.1976), *aff'd in part, reversed in part on other grounds* 597 F.2d 556 (5th Cir. 1979).

■ The corollary is that while a party cannot contradict the meaning of his words by denying that he intended this meaning, he is not bound by the interpretation which may be placed on ambiguous language unless he permitted or caused the ambiguity. Therefore, where a phrase is reasonably capable of different interpretations, and is in fact differently understood, there is no contract. 1 W. Jaeger, *Williston on Contracts* § 95 (3d ed. 1957).

■ A grievance/arbitration procedure established by contract is a "term or condition of employment", thus, a mandatory subject of bargaining within the meaning of Section 8(a)(5), so that the employer cannot make a unilateral *mid-term* change. *NLRB v. Independent Stave Co.*, 591 F.2d 443 (8th Cir. 1979). However, under *Hilton-Davis Chemical Company, supra*, at the expiration of the collective bargaining agreement, the employer can unilaterally terminate the arbitration provisions, so that a distinction is made between the grievance procedure and the provisions for arbitration contained therein. There, the NLRB stated:

"[During the post-contract hiatus] employers and unions must continue to meet and confer and to seek agreement in good faith, not only over [the new agreement], but also over employee grievances which may arise during such hiatus."

■ Thus, an employer cannot refuse to process a discharge grievance filed pursuant to the grievance procedure of an expired contract, short of submitting the dispute to arbitration, without violating Section 8(a)(5). *See Newspaper Printing Corp.*, 221 NLRB 811, 91 LRRM 1077 (1975). And, following expiration of the contract, an employer cannot unilaterally alter the grievance procedure, other than the arbitration provisions, without violating Section 8(a)(5). *See Turbodyne Corp., Gas Turbine Division*, 226 NLRB 522, 93 LRRM 1378 (1976).

The foregoing NLRB decisions give us a perspective from which to view Wollett's statement at the April 1975 meeting, but do not involve interpretation of an interim agreement between the Company and the Union. In *Taft Broadcasting Co. v. NLRB*, 441 F.2d 1382 (8th Cir. 1971), following expiration of a collective bargaining agreement, a draft agreement was drawn up but not signed by the union. The employer informed the union by letter that "it is our

intention to continue in effect the wages, hours, and other conditions of employment presently in effect as fully set forth in the [draft agreement], and *we will continue handling any grievances that may arise in accordance with the procedure set forth therein.*" (Emphasis added.) Article VII of the draft agreement provided for a "Grievance Procedure and Arbitration". In a ruling upheld by the Court of Appeals, the NLRB found that the letter was the basis for an interim agreement that the various terms and conditions of employment as well as the *entire* grievance procedure, as outlined in the draft agreement, would continue. Since the employer expressly agreed to continue the grievance procedure, implying arbitration, in addition to the terms and conditions of employment, *Taft Broadcasting* is inapposite.

Under factual circumstances similar to those in the instant case, two Board approved decisions of NLRB Administrative Law Judges (ALJ) held there was no agreement to extend the contract following its expiration and hence no duty to arbitrate disputes arising during the post-contract hiatus. In *S & W Motor Lines, Inc.*, 236 NLRB No. 133, 98 LRRM 1488 (1978), the ALJ was faced with conflicting testimony on what was said at a negotiation session

prior to the expiration of a collective bargaining agreement.[4] The ALJ admitted that from a demeanor standpoint, there was no basis for crediting one witness over the other. Nevertheless, he was persuaded that there was no agreement to a contract extension, and an important consideration was the union's subsequent rejection of its no strike obligation contained in the expired contract:

"[W]hile an agreement not to strike might well be a persuasive factor in agreeing to a contract extension it is clear from the record, and even admitted by [the Union], that the Union never agreed that it would not strike at sometime or another. Had there been a contract extension the Union would have been contractually bound not to strike in view of the no-strike provision in the contract. Furthermore, an agreement not to strike is of little value unless it is of some specified or determinable duration. As seen by its refusal to agree to the proposal of [the Company] on September 2 requiring a 15-day notice of intent to strike the Union was free to strike anytime it decided to forego the retroactive application of any negotiated increases. Thus, there was no real *quid*

---

4. The ALJ Decision stated at pp. 15–16:

"The critical point in the session was the alleged extension of the old agreement which was due to expire at midnight on the following day. Blevins testified that he noted to Pollard that they were only in the second meeting on negotiations, that they had gotten very little accomplished and that they were 'still in exploration of some of the proposals.' Accordingly, Blevins advised Pollard that the Union had no quarrel and 'certainly would be willing to agree to continue working under the terms of the existing contract and continue to negotiate to see if we would reach a contract provided that the employer would agree to pay to the employees any economic or monetary items that would be negotiated during the course of negotiations which might be contained in the contract. . . .' Blevins testified he added the further proviso that Respondent continue to apply the terms of the existing contract. Pollard responded that he would have to caucus with Brown and Sharp.

Pollard did have his caucus and when he returned, according to Blevins, stated that they

were agreeable to continuing negotiations and to continue to live under the terms of the existing agreement provided the employees would continue to work and stay on the job and they were also agreeable to anything negotiated during the course of negotiations being retroactive to August 20. Pollard then wrote up some document on the retroactivity and passed it to Blevins to sign, but Blevins rejected it with a remark indicating distrust of attorneys and then drafted his own language as follows:

'The parties hereby agree that any monetary or economic increases that are negotiated between the parties during the course of negotiations will be retroactive to the date of August 20, 1976, and will be paid accordingly upon ratification of the contract. It is further understood and agreed that any strike, work stoppage, walkout, slowdown, picketing if any authorized or unauthorized will terminate the agreement reached on monetary or economic items being retroactive to August 20, 1976.'"

*pro quo* for [the Company's] agreement to a contract extension."

236 NLRB No. 113, ALJ Decision at 22.

In *Cardinal Operating Company*, 246 NLRB No. 42 (October 26, 1979), the ALJ rejected the general counsel's argument that an agreement to extend the contract could be implied from statements by management representatives during negotiating sessions that except for dues deductions the company intended to live up to its responsibilities under the agreement and that wages and benefits enjoyed by employees under the contract would continue.

"From the record as a whole, it does not appear that the parties did agree to extend their contract. The fact that various management representatives referred to the Respondent's intention to continue the wages, benefits and other terms of the contract after expiration does not, without more, indicate an agreement to extend. It is settled that an employer's duty to observe wages, hours and other terms and conditions of employment, including the grievance procedure, survives the expiration of the collective bargaining agreement, and that the Respondent was obligated to continue these aspects of the agreement after May 31 even in the absence of an extension agreement. In addition, such an accord lacked both consideration and duration. . . . . Here, as in *S & W Motor Lines*, there was no agreement by the Union to refrain from striking and there was no reference made to an extension of the contract for a definite period. Judge Brandon's observation in *S & W Motor Lines* that it would have been illogical for the Employer to agree to an extension of the contract for an indefinite period is equally applicable here."

246 NLRB No. 42, ALJ Decision at 23–24.

■ As we have resolved the conflicting testimony, the Company did not expressly agree to extend the contract. Furthermore, we cannot imply an agreement to extend the contract from Wollett's statement which was nothing more than verbalizing the Company's legal obligations. We do not think the Union could reasonably interpret the Company's offer to maintain terms and conditions of employment as an offer to maintain all the terms and conditions of the contract. We note, as did the ALJs in *S & W Motors, Inc., supra*, and *Cardinal Operating Co., supra*, that this Union did not consider itself bound by the expired contract's no strike clause for a definite period. Hence, there was no *quid pro quo* for a contract extension.

In conclusion, we find that the Union has failed to establish by the preponderance of the evidence that there was an agreement to extend the contract, including an agreement to arbitrate.

■ One issue remains which has not been stressed by the parties but which, nevertheless, cannot be allowed to pass without comment. In *Nolde Brothers, Inc. v. Local 358, Bakery & Confectionery Workers Union*, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977), the Supreme Court held that where the parties to a collective bargaining agreement have agreed to subject certain matters to a grievance and arbitration process, the parties' obligations under their arbitration clauses survive contract termination when the dispute is over an obligation arguably created by the expired contract. Some NLRB decisions have indicated that in light of *Nolde Brothers*, the validity of *Hilton-Davis Chemical Company, supra*, is questionable. In *S & W Motors, Inc., supra*, the ALJ assumed *arguendo* that *Hilton-Davis* was no longer viable law, but distinguished *Nolde Brothers*. In *ESB, Inc.*, 246 NLRB No. 51 (November 1, 1979), the ALJ expressly held that the *Hilton-Davis* rule was altered by *Nolde Brothers*. That decision was vacated by the Board on different grounds. In *American Sink Top & Cabinet Co.*, 242 NLRB No. 53, 101 LRRM 1166 (1979), a three member panel of the NLRB ruled, under facts similar to ours, that the duty to arbitrate survived expiration of the contract, thus altering the rule of *Hilton-Davis*.

■ The *Nolde Brothers* decision was based on a presumption—"[in the] absence

of some contrary indication there are strong reasons to conclude that the parties did not intend their arbitration duties to terminate automatically with the contract." 430 U.S. at 253, 97 S.Ct. at 1073, 51 L.Ed.2d at 309. In *S & W Motors, Inc., supra*, the ALJ distinguished *Nolde Brothers* because the expired contract in *S & W Motors* provided: "The Parties agree to . . . use [the grievance committee] as a means of peaceful settlement of Grievance *during the term of this contract.*" (Emphasis added.) Similarly, in the 1974–1975 Agreement in this case, a grievance subject to the grievance procedure is defined as a dispute or complaint arising under *and during the term of the agreement.* (Emphasis added.) Thus, unlike the contract in *Nolde Brothers*, there is an indication here that the parties did not intend the arbitration procedure to extend beyond the life of the contract. The Union's petition seeking an order to compel arbitration will therefore be denied and the action dismissed.