**UNITED STEELWORKERS OF AMERICA, AFL–CIO; and James Garry, Quinto Delissio, Patrick McGhen, and Ernest A. Oblack, on behalf of themselves and others similarly situated**

v.

**FORT PITT STEEL CASTING DIVISION–CONVAL–PENN INC., Division of Conval Corporation and James P. Spresser as Pension Board Member and Agent for Pension Board of Fort Pitt Steel Casting, Division–Conval–Penn, Inc., Pension Plan for Members of Local 1406 United Steelworkers of America.**

Appeal of Fort Pitt Steel Casting, Division of Conval–Penn, Inc., Division of Conval Corporation.

No. 80–1431.

United States Court of Appeals, Third Circuit.

Argued Oct. 9, 1980.

Decided Nov. 20, 1980.

---

Henry J. Wallace, Jr. (argued), Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Rody P. Biggert, Craig B. Mousin, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for appellant.

Rudolph L. Milasich, Jr. (argued), Carl B. Frankel, Legal Dept., United Steelworkers of America, Pittsburgh, Pa. (Bernard Kleiman, Chicago, Ill., of counsel) for appellee.

Before SEITZ, Chief Judge, HIGGINBOTHAM, Circuit Judge, and MEANOR, District Judge.*

## OPINION OF THE COURT

SEITZ, Chief Judge.

Fort Pitt Steel Casting (Fort Pitt) appeals from an order of the district court granting summary judgment in favor of the United Steelworkers of America (the Union), and ordering Fort Pitt to arbitrate six grievances filed by the Union.

### I.

We commence with an undisputed factual narration. Fort Pitt manufactured and sold steel castings at its plant in McKeesport, Pennsylvania. The Union was the collective bargaining representative for Fort Pitt's production, maintenance and clerical workers. Fort Pitt and the Union executed a three–year collective bargaining agreement on March 3, 1975 (the 1975 Agreement). The 1975 Agreement contains a broad arbitration clause, which provides for the arbitration of "any request or complaint." It also contains a similarly broad no–strike and no–lockout clause, which sus-

* Honorable H. Curtis Meanor, United States District Judge for the District of New Jersey, sitting by designation.

pends the duty to arbitrate the grievance in question or other grievances during a strike or lockout. The 1975 Agreement was to expire on March 3, 1978.

Negotiations for a new contract began prior to the expiration date of the 1975 Agreement. When no agreement was reached by March 3, 1978, the Union commenced a lawful strike in support of its bargaining position. Paragraph 144 of the 1975 Agreement provides that either party can strike or lockout in support of its position if an agreement on new contract terms has not been reached within sixty days after one party gave notice of its desire to terminate the contract and to negotiate over certain issues.[1]

The strike lasted for almost nine months. During this strike the parties continued to negotiate until November 30, 1978. On that date, when the Union refused to accept Fort Pitt's "final offer," Fort Pitt permanently closed the McKeesport facility. The parties then entered into negotiations regarding the effects of the shutdown. When they could not agree to a shutdown settlement, negotiations terminated.

On January 5, 1979 and January 29, 1979, the Union filed a series of grievances. These grievances arose when Fort Pitt, at the time it closed the plant, refused to honor certain obligations that the Union contended were due the employees under the 1975 Agreement. Fort Pitt settled some of the grievances, agreed that one was arbitrable, but contended that the six grievances that form the basis of this suit were not arbitrable under the 1975 Agreement. These six grievances address: (1) The failure to pay severance pay to the employees who were terminated when the plant was closed; (2) the refusal to pay vacation pay to the employees for calendar year 1978; (3) the cancellation of life insurance coverage for all retirees; (4) the improper deduction of social security benefits from pension benefits of retirees; (5) the cancellation or termination of life insurance coverage under the Pension Plan for persons retiring after March 3, 1978; and (6) the refusal to pay Supplemental Unemployment Compensation Benefits (SUB) to the terminated employees or to distribute the SUB fund when operations ceased.

On September 6, 1979, the Union filed suit in the United States District Court for the Western District of Pennsylvania to compel arbitration under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1976). This suit was delayed pending settlement negotiations, which broke down in November 1979. Fort Pitt requested that the district court permit discovery for the limited purpose of resolving the issue of arbitrability. In response, the Union filed a motion for summary judgment. Fort Pitt filed a cross-motion for summary judgment on five of the six grievances. With respect to the grievance over severance pay, it filed a response that sufficient issues of material fact had been raised to preclude summary judgment. The district court granted the Union's motion for summary judgment, holding that all six grievances filed by the Union were arbitrable, and it ordered Fort Pitt to comply with the grievance and arbitration provisions of the 1975 Agreement.

Fort Pitt attacks the district court's decision on two grounds. First, it argues that *Nolde Brothers, Inc. v. Local 358, Bakery & Confectionery Workers*, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977), does not control the disposition of this case because: (A) the 1975 Agreement, by clear implication, provides that the arbitration clause shall not survive termination; (B) the Union engaged in a prolonged strike after the 1975 Agreement expired; and (C) the parties bargained to impasse over the severance-pay provision. Second, Fort Pitt argues that even if the arbitration clause survives termination of the 1975 Agreement, each of the six grievances filed by the

---

1. For the history of this long labor dispute, see *United Steelworkers of America v. Fort Pitt Steel Casting*, 598 F.2d 1273 (3d Cir.1979) (*Fort Pitt I*). In *Fort Pitt I*, we characterized the Union's strike as a "lawful work stoppage."

*Id.* at 1276. Fort Pitt does not contest this characterization. Moreover, Fort Pitt has not claimed that the Union failed to comply with ⸀ 144.

Union is not arbitrable under the 1975 Agreement.

## II.

■ In *Nolde*, the Supreme Court held that the arbitration clause of a collective bargaining agreement survives contract termination unless the parties indicate a contrary intent, either expressly or by clear implication. *See* 430 U.S. at 255, 97 S.Ct. at 1074. Thus, the parties must arbitrate claims that arise under the contract, but are based on events occurring after its termination. In *Nolde,* the parties had begun negotiations in May 1973 and the contract expired on August 27, 1973. Negotiations for a new contract continued until August 31, 1973, when the company permanently closed its plant in response to the union's threatened strike.

In holding that the arbitration clause survived contract termination, the *Nolde* Court emphasized the well–established labor policy favoring arbitration as a means of settling labor disputes. The Court noted that although contract termination changes the relationship between the union and the employer, many of the considerations underlying a decision to resolve disputes by arbitration are unaffected by contract termination. For example, the Court found that:

> The contracting parties' *confidence in the arbitration process* and an *arbitrator's presumed special competence* in matters concerning bargaining agreements *does not terminate with the contract.* Nor would their interest in obtaining a *prompt and inexpensive resolution* of their disputes by an expert tribunal. Hence, there is little reason to construe this contract to mean that the parties intended their contractual duty to submit grievances and claims arising under the contract to terminate immediately on the termination of the contract; *the alternative remedy of a lawsuit is the very remedy the arbitration clause was designed to avoid.*

*Id.* at 254, 97 S.Ct. at 1073 (emphasis added). With this reasoning in mind, we will examine Fort Pitt's arguments that *Nolde* does not control the disposition of this case.

### A.

■ Fort Pitt points to three provisions of the 1975 Agreement as evidence that the parties did not intend that the arbitration clause survive contract termination. First, it argues that the duty to arbitrate is limited to the life of the agreement because the term "employee" is defined in paragraph nine of the 1975 Agreement as production, maintenance and clerical workers for which "the Union is, or may be *during the life of this Agreement,* certified" as the exclusive collective–bargaining representative. (Emphasis added). This language, however, does not constitute the clear indication of intent that the *Nolde* Court contemplated as sufficient to negate the presumption of arbitrability. Instead, it merely provides that the 1975 Agreement applies to all employees who work in units for which the Union is certified during the life of the Agreement. It says nothing about the duration of the duties of the parties to the 1975 Agreement, including the duty to arbitrate.

■ Second, Fort Pitt argues that the arbitration clause cannot survive plant shutdown because only *employees* have the right to file grievances under paragraph 88(2), and the individuals who filed grievances in this case were no longer employees. However, in *Nolde*, the arbitration clause provided that "[a]ll grievances shall be first taken up between the Plant Management and the Shop Steward." The Court did not find it significant that there was no shop steward after the shutdown of the plant. Moreover, as we stated in *United Steelworkers v. Canron*, 580 F.2d 77, 82 (3d Cir. 1978), "[i]n determining . . . the arbitrability of the dispute–the 'bottom line' is not calculated by the status of the grievants but by the nature of the duties and obligations of the parties under the contract." Therefore, the fact that the 1975 Agreement limits the right to file grievances to "employees" does not indicate that the parties intended to preclude arbitration over the issues in this case.

Third, Fort Pitt argues that paragraph 142, which provides that any grievance that arose *prior* to March 3, 1975 will be subject to the grievance and arbitration procedures of the 1975 Agreement, indicates by negative implication that the parties intended that grievances arising after the March 3, 1978 expiration date would not be subject to arbitration under the 1975 Agreement. We are not convinced that this provision provides any indication of the parties' intent as to the status of the arbitration clause during the period between the expiration of the 1975 Agreement and the institution of a new collective bargaining agreement. Even if it can be said to provide some indication of the parties' intent, it is not the "clear implication" that the *Nolde* Court considered sufficient to rebut the presumption of arbitrability. Therefore, we conclude that the parties to the 1975 Agreement did not indicate, either expressly or by clear implication, that the arbitration clause would not survive termination of the Agreement.

### B.

Fort Pitt also argues that the prolonged strike by the Union distinguishes this case from *Nolde* and dictates that Fort Pitt should not be compelled to arbitrate these grievances. Fort Pitt bases this argument on the theory that the no–strike clause is the quid pro quo for the agreement to arbitrate. *See e. g., Gateway Coal Co. v. UMW,* 414 U.S. 368, 382, 94 S.Ct. 629, 639, 38 L.Ed.2d 583 (1974); *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 455, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957). Fort Pitt contends that arbitration is the preferred method for settling disputes *in lieu* of resort by a union to economic force via strike. Because the Union used its strongest economic weapon, the strike, Fort Pitt argues that it no longer should be bound by the arbitration clause.

This substantial argument brings into focus the difficulty of reconciling the rationale of *Nolde* with those cases that hold that a federal court may enjoin a strike under section 301 on the condition that the employer submit to arbitration over the grievance in question. *See, e. g., Boys Markets, Inc. v. Retail Clerks Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). If the arbitration clause survives termination under *Nolde* and the coterminous no–strike clause does not, the employer remains bound to arbitrate, although it is deprived, in part at least, of the consideration flowing to it from its agreement to arbitrate, *i. e.* the no–strike clause.[2]

Under the circumstances of this case, however, resolution of this difficult question is not necessary. The premise underlying Fort Pitt's argument is that the Union, by striking, "demonstrated that the [1975 Agreement] no longer constrained the Union to settle disputes only by arbitration, and, therefore, the Union waived whatever right it may have had to arbitrate this dispute after the expiration of the contract." Therefore, Fort Pitt argues that it should not be compelled to fulfill its concomitant promise to arbitrate. If, however, the Union's strike did not violate the no–strike clause–assuming for the moment that the clause survived contract expiration–then Fort Pitt's argument is not persuasive. Fort Pitt did not address, either on this appeal or before the district court, this crucial point: Whether the Union's strike in this case would have violated the no–strike clause if it had survived contract expiration. Instead, Fort Pitt seems to rely on the argument that the Union, by engaging in an economic strike in support of its bargaining position, waived its right to compel arbitration, regardless of whether the no–strike clause was intended to reach such a strike. We cannot accept this broad waiver argument. In our view, under the quid pro

2. The National Labor Relations Board recently confronted this problem and it held that the no–strike clause survives contract termination "to the [same] extent as the duty to arbitrate over issues created by or arising out of the expired contract." *Goya Foods, Inc.,* 238 N.L. R.B. No. 204, 1978–1979 NLRB Dec. (CCH) " 15,078 (Sept. 29, 1978). The Board reasoned that it would be anomalous to subject an employer to economic pressure while still requiring it to arbitrate the grievance over which the employees were striking.

quo theory, the Union's strike altered Fort Pitt's duty to arbitrate the grievances arising after the expiration of the Agreement only if the strike was one forbidden by the no–strike clause. Therefore, we must examine both the subject matter of the strike and the no–strike clause to determine whether that clause was intended to prohibit the type of strike engaged in by the Union.

The Union went on strike before the six grievances that it seeks to arbitrate arose. The strike was a lawful strike in support of the Union's bargaining position, permissible under the 1975 Agreement[3] and protected under the National Labor Relations Act. During the course of bargaining for a new agreement, the Union and Fort Pitt disagreed over including provisions that would provide for obligations and duties similar to those that the Union alleges Fort Pitt breached under the 1975 Agreement. However, the Union's strike in support of its bargaining position on these issues cannot be characterized as a strike over the grievances it now seeks to arbitrate, *i e.* Fort Pitt's failure to give employees rights that allegedly accrued under the 1975 Agreement. Because the Union did not strike over issues that it was required to arbitrate, the Union's strike did not violate the no–strike clause unless the parties intended that the no–strike clause encompass strikes over nonarbitrable subjects, and that it prohibit strikes in support of the Union's bargaining position while bargaining over terms to be included in a new collective bargaining agreement.

■ In interpreting the breadth of the no–strike clause, we are aided by the notion of coterminous interpretation, which is based on the theory that the no–strike clause is the quid pro quo for the agreement to arbitrate. Under coterminous interpretation, if the subject matter of a strike is arbitrable, then the strike violates the no–strike clause. This theory was developed largely in the area of implied no–strike obligations. *See, e. g., United States Steel*

*Corp. v. UMW,* 548 F.2d 67 (3d Cir.1976), *cert. denied,* 431 U.S. 968, 97 S.Ct. 2926, 53 L.Ed.2d 1063 (1977). However, recently we held that the quid pro quo rationale that underlies coterminous interpretation applies when the collective bargaining agreement contains an express no–strike clause as well as when the obligation not to strike is implied from the arbitration clause. *See Delaware Coca–Cola Bottling Co. v. General Teamster Local 326,* 624 F.2d 1182 (3d Cir. 1980) (holding that a sympathy strike does not violate the no–strike clause because the union was not striking over an arbitrable issue).

Coterminous interpretation must be applied to the facts in each case. *See, e. g., Gateway Coal Co.,* 414 U.S. at 382, 94 S.Ct. at 639. The no–strike clause in the 1975 Agreement is broadly worded. It provides that:

> [A]n interruption or impeding of work, stoppage or strike on the part of the Union or a lockout on the part of the Company, shall be a violation of this Agreement, and ... under no circumstances shall the parties ... *discuss the grievances in question or any other grievances while the work interruption ... is in effect.*

(Emphasis added). In *Delaware Coca–Cola,* however, we noted that a "broadly worded no–strike clause does not waive the right to strike over nonarbitrable matters that are not covered by the strikers' contract." 624 F.2d at 1187. *See also Buffalo Forge Co. v. United Steelworkers,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). In this case, there is no evidence that the Union waived its right to strike in support of its bargaining position when it agreed to the no–strike clause in the 1975 Agreement. The no–strike clause is tied directly to the arbitration clause because it is located within the section entitled "Adjustment of Grievances" along with the arbitration clause, and because it provides for suspension of the duty to arbitrate "the *grievance in question* or any other grievances" during a

---

**3.** Fort Pitt has not claimed that the Union failed to comply with ¶ 144, which permits the

Union's strike. *See* note 1 *supra* and accompanying text.

strike or lockout. (Emphasis added). Moreover, paragraph 144 of the Agreement expressly permits each party to engage in a strike or lockout in support of its bargaining position if no agreement has been reached within sixty days after giving notice.

■ Therefore, we conclude that Fort Pitt and the Union intended that the obligation not to strike or lockout would be coterminous with the duty to arbitrate, and that the no–strike clause would have no application to the use of economic weapons in support of either party's bargaining position. Because the Union's strike in this case cannot be said to have violated the no–strike clause, we need not decide whether the no–strike clause survives contract termination to the same extent as the arbitration clause. We conclude that the Union's strike, which was not over the grievances it seeks to arbitrate, does not alter Fort Pitt's obligation to arbitrate the grievances that arose after termination of the Agreement.

### C.

■ Fort Pitt's final argument that *Nolde* does not control the disposition of this case centers on its claim that the parties engaged in extensive negotiations and bargained to impasse on the severance–pay provision. First, Fort Pitt argues that the ten–month negotiation period alone creates a different situation from that presented in *Nolde*. However, in *Nolde* the parties had engaged in extensive negotiations before the plant was closed. We do not believe that the result in this case should be different because the negotiations between the Union and Fort Pitt lasted longer than those in *Nolde*. The Union did not delay unreasonably in asserting its claim for arbitration. Although the grievances are based on rights that the Union alleges accrued under the 1975 Agreement, they did not arise until Fort Pitt had closed the plant and subsequently asserted that it had no obligation to comply with certain provisions of the expired Agreement. Therefore, we conclude that the ten–month negotiation

period between contract termination and the claim for arbitration does not constitute a sufficient alteration in the relationship between the parties to absolve Fort Pitt of its duty to arbitrate.

Second, Fort Pitt argues that because it bargained to impasse over severance pay, the severance–pay provision in the 1975 Agreement is no longer extant. This argument derives from those cases holding that an employer may act unilaterally after it bargains to impasse in good faith over mandatory subjects to be included in a new collective bargaining agreement. *See, e. g., American Federation of Television & Radio Artists v. NLRB*, 395 F.2d 622 (D.C.Cir. 1968). The employer may act unilaterally only if its action is reasonably comprehended within its preimpasse bargaining proposals. *See, e. g., NLRB v. Crompton–Highland Mills, Inc.*, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 (1949). The unilateral action presumably "breaks" the impasse, and the parties must resume bargaining.

■ At the outset, we note that it appears that Fort Pitt bases its impasse claim, at least in part, on the negotiations between the parties concerning the effects of the shutdown. To support its argument that the parties had bargained to impasse, Fort Pitt states that "[d]uring the negotiations *over the effects of the shutdown,*" the Union refused to engage in further discussions *"unless and until Fort Pitt agreed to pay the severance pay under the expired contract."* (Emphasis added). This alleged "impasse" appears to be based on the fact that the Union insisted that Fort Pitt comply with the severance–pay provision of the 1975 Agreement–the very issue that the Union seeks to arbitrate. The Union's insistence, during negotiations concerning the effects of a shutdown, that Fort Pitt give employees certain rights that the Union alleges accrued under the expired agreement should not enable Fort Pitt to avoid arbitrating this issue. Moreover, this "impasse" did not occur in the course of bargaining over mandatory subjects to be included in a collective bargaining agreement; it occurred after the plant was

closed.[4] The parties were not attempting to agree on terms to govern their ongoing relationship, but were trying to settle disputes over the effect of the termination of their employment relationship.

Even if we assume that the parties did bargain to impasse during the negotiations for a new collective bargaining agreement before the plant was closed, this fact alone does not absolve Fort Pitt of its duty to arbitrate the Union's grievances. The Union seeks arbitration of these claims because it believes that the applicable provisions of the 1975 Agreement provided for the accrual of certain rights even though they might not be realized until after the Agreement had expired. There is no reason why the parties could not have agreed to such an arrangement. *See John Wiley & Sons v. Livingston*, 376 U.S. 543, 555, 84 S.Ct. 909, 917, 11 L.Ed.2d 898 (1964). Although we express no view on the merits of the Union's interpretation of the 1975 Agreement, we note that the fact that the parties bargained to impasse over provisions that would have been included in a new collective bargaining agreement does not necessarily deprive employees of rights that have accrued under the expired agreement. Therefore we conclude that the arbitrator should settle the dispute between the Union and Fort Pitt over the meaning of the provisions of the 1975 Agreement and its applicability to the present situation.

Finally, we note that this case does not involve a situation in which the Union, after having been unsuccessful at the bargaining table, attempts to use the surviving arbitration clause either to negotiate a new agreement or to interfere with the employer's right to act unilaterally after bargaining to impasse in good faith in the course of an ongoing employment relationship.[5] In this case, when the parties reached impasse, Fort Pitt lawfully elected to close its plant rather than to impose unilateral terms and continue good faith bargaining. It was this election to close the plant, coupled with Fort Pitt's interpretation of the applicability of the 1975 Agreement, that gave rise to these grievances. Under these circumstances, we hold that the proper forum for the resolution of this dispute over the meaning of the 1975 Agreement is the arbitral forum chosen by the parties under that Agreement. The arbitrator will determine the meaning of the disputed provisions of the 1975 Agreement and the effect of the plant shutdown on them in light of the fully developed facts. *See Local 595, International Association of Machinists v. Howe Sound Co.*, 350 F.2d 508 (3d Cir.1965).

### III.

Fort Pitt also contends that, even if the arbitration clause survives expiration of the agreement, each of the Union's six grievances is nonarbitrable. Fort Pitt appears to argue both that each grievance is nonarbitrable as a matter of law, and that genuine issues of material fact exist so as to preclude the granting of summary judgment. When deciding a claim for arbitration under section 301, we must adhere to the

4. We do not mean to imply that it is not mandatory that an employer bargain with a Union over the effects of a shutdown. We merely conclude that an "impasse" reached during these negotiations, which is based on differing interpretations of rights allegedly accrued under an expired agreement, does not allow an employer to impose unilaterally its interpretation of that agreement.

5. This case therefore is distinguishable from *Washington–Baltimore Newspaper Guild Local 35 v. Washington Post Co.*, 85 Lab.Cas. (CCH) ¶ 11,243 (D.D.C. April 4, 1979). In *Washington–Baltimore Newspaper Guild*, the district court had ordered arbitration of certain grievances one year after the contract had expired.

At that time, the union did not claim arbitration for other issues, *i.e.* dues checkoff, union security, unilateral interim wage increases made after impasse, and contributions to the health and welfare fund, but elected to "raise these issues at the bargaining table and before the NLRB." *Id.* at 20,886. The union was unsuccessful in bargaining and before the Board, and sought to invoke the arbitration clause as to these issues three years after the contract had expired. The court denied arbitration, reasoning that "[t]o accept plaintiff's contention that these issues are now a proper subject of arbitration would be to impose a self–perpetuating system of arbitration in place of normal collective bargaining." *Id.*

congressional policy favoring arbitration. We should not deny an order to arbitrate a particular grievance "unless it may be said *with positive assurance* that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960) (emphasis added), *quoted in Westinghouse Broadcasting Co. v. Local 804, International Alliance of Theatrical State Employees*, 616 F.2d 97, 100 (3d Cir.1980).

Fort Pitt's claim that the severance–pay dispute is nonarbitrable is based on its argument that the bargaining impasse over whether to include a similar provision in a new collective bargaining agreement relieved it of any obligation to arbitrate claims under the severance–pay provision of the 1975 Agreement. For the reasons stated in the above section, we reject this argument.

Fort Pitt claims that it should not be compelled to arbitrate the Union's claim for vacation benefits because the Union litigated the withholding of vacation pay as an unfair labor practice before the National Labor Relations Board, and the Board found it to violate both section 8(a)(1) and section 8(a)(3) of the National Labor Relations Act. The Board's decision is presently pending before the United States Court of Appeals for the Ninth Circuit. Fort Pitt argues that the Union, having chosen the Board as the forum for dispute resolution, should be required to follow that action to its fruition. Fort Pitt's argument is misplaced. We agree with the district court that whether particular conduct constitutes an unfair labor practice is a distinct question from whether Fort Pitt must arbitrate a grievance resulting from such conduct. Moreover, the Supreme Court stated in *Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 272, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1964), that "the possibility of a conflict is

no barrier to resort to a tribunal other than the Board." As a result, the district court had jurisdiction to compel Fort Pitt to arbitrate the vacation–pay claim, and we find no error in the district court's holding that Fort Pitt must arbitrate this grievance.

Fort Pitt also argues that the Union's grievances over the cancellation of life insurance for all retirees, the improper deduction of social security benefits from pension benefits, and the cancellation of insurance benefits to all employees retiring after March 3, 1978, are subject only to the more narrow grievance and arbitration provisions of the Pension Plan.[6] However, the broad arbitration clause of the 1975 Agreement covers "any request or complaint," and does not purport to exclude disputes over pension benefits. The pension and insurance benefits are alluded to in the 1975 Agreement, and thus arguably are incorporated by reference. *See Westinghouse Broadcasting Co.*, 616 F.2d 97. Under these circumstances, we cannot say "with positive assurance" that these claims are not arbitrable under the 1975 Agreement.

Moreover, the grievance procedure of the Pension Plan does not require employees with the specified types of grievances to pursue the first three steps of the grievance–arbitration procedure outlined in the 1975 Agreement. Therefore, the Pension Plan's arbitration clause arguably is not intended to exclude arbitration of other claims under the arbitration clause of the 1975 Agreement, but only to allow expedited grievance procedures for those limited issues. Fort Pitt's further claim that the cancellation of insurance benefits to employees retiring after March 3, 1978 is nonarbitrable because the 1975 Agreement only covers employees retiring during the life of the Agreement goes to the merits of the dispute and not to its arbitrability. Therefore, we agree with the district court that these disputes are subject to arbitration.

**6.** The grievance procedures under the Pension Plan allow for grievances only over issues relating to years of continuous service, the age of applicant, and the existence of a permanent

incapacity, and allow the grievant to invoke the grievance–arbitration procedures of the 1975 Agreement at Step Four (arbitration before impartial umpire).

Finally, Fort Pitt's claim that the grievance over the SUB benefits is nonarbitrable because there is no SUB Plan also must be rejected. We agree with the district court that this argument goes to the merits of the dispute and not to its arbitrability. The 1975 Agreement refers to SUB benefits, and the Union and Fort Pitt disagree over whether such benefits exist. We conclude that the arbitrator should resolve this dispute.

We conclude that the district court did not err in ordering arbitration on the Union's motion for summary judgment. The issues of fact that Fort Pitt argues preclude summary judgment go to the merits of the six grievances and not to their arbitrability. Therefore, we hold that the district court was correct in its determination that each of the six grievances filed by the Union is subject to the broad arbitration clause of the 1975 Agreement.

## IV.

We conclude that the parties to the 1975 Agreement did not provide for the termination of the arbitration clause at the expiration of the Agreement, either expressly or by clear implication. Further, neither the fact that the Union engaged in a lawful strike in support of its bargaining position at contract termination, nor the fact that the parties engaged in extensive negotiations allegedly resulting in impasse on certain issues, relieves Fort Pitt of its duty to arbitrate the Union's six grievances. Finally, we find that each of the six grievances filed by the Union is arbitrable under the 1975 Agreement.

## V.

The order of the district court will be affirmed.