**GRAPHIC COMMUNICATIONS UNION CHICAGO PAPER HANDLERS' & ELECTROTYPERS' LOCAL NO. 2, Plaintiff,**

v.

**CHICAGO TRIBUNE COMPANY and Chicago Newspaper Publishers' Association, Defendants.**

No. 84 C 10879.

United States District Court, N.D. Illinois, E.D.

July 11, 1985.

Edwin H. Benn, Donald W. Cohen, Asher, Pavalon, Gittler and Greenfield, Chicago, Ill., for plaintiff.

Richard L. Marcus, Bruce J. Rasch, Reuben & Proctor, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

In this action under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, plaintiff Chicago Paper Handlers' & Electrotypers' Local No. 1 (hereafter "Union") seeks to compel arbitration of a dispute over a unilateral change in hiring practices instigated by defendant Chicago Tribune Company ("Tribune"). The matter is currently before the court on the motion of defendants Tribune and the Chicago Newspaper Publishers' Association ("CNPA") to dismiss, and the motion of plaintiff for summary judgment and for fees. For the reasons set forth herein, the motions to dismiss and for fees are denied, and the motion for summary judgment is granted.

## FACTS

The following facts, as set forth in the exhibits to plaintiff's complaint and the affidavit of William Roberts, Union president, are undisputed by the defendants and are therefore deemed admitted. *See* Local Rule 12(f). Plaintiff Union is a labor organization affiliated with the Graphic Communications Union, and represents all handlers of papers employed by defendant Tribune. Defendant CNPA is the Tribune's bargaining representative. Plaintiff and the CNPA, on behalf of the Tribune, entered into a Collective Bargaining Agreement ("Agreement") to become effective September 3, 1981 and to remain in full force and effect until September 3, 1984. (Complaint Exhibit "A"). That contract sets forth in detail matters pertaining to wages, hours, and working conditions but is silent on the question of hiring procedures. The Agreement contains no express "no strike" clause. Such an obligation is inferred, however, from the Agreement's stated object "to prevent lockouts, boycotts, strikes and other forms of concerted action" in favor of conciliation, and from its requirements of mandatory arbitration.

The contract contains three arbitration clauses for implementing this "principle of conciliation." First of these is an "interest arbitration" clause. Under that clause, any party proposing an amendment to the contract or a new contract to take its place upon expiration shall notify the other party sixty days prior to the expiration date. Failure to give notice shall be construed as a renewal of the Agreement on a year to year basis. If agreement in negotiating an amendment or a new contract proves impossible, the difference "shall be arbitrated."

The second arbitration clause—the "speedy arbitration" clause—permits the Union to maintain the status quo with regard to the scale and hours provided in the Agreement or "mutually agreed to working conditions" pending the resolution of "grievance adjustment, conciliation or arbitration." This provision applies "[i]n the event of a difference" but contains the caveat that working conditions shall remain unchanged pending arbitration only if "such working conditions are set forth in the contract or are the subject matter of

agreements arrived at and reviewed by the parties."

The final arbitration provision of the contract is a Joint Standing Committee clause for resolving "all questions, except those qualifying for adjudication under the 'speedy arbitration' provisions of this Section, which may arise as to the construction to be placed upon any of the clauses of this Agreement or any alleged violations thereof, which cannot be settled otherwise." Nowhere else does the Agreement define or limit the power of the arbitrator.

In August 1984, the parties began negotiating a new contract. In accordance with prior practice, the company continued to maintain existing conditions after expiration while negotiations continued. On September 5, 1984, two days after the old contract expired, the Tribune advised the Union that, effective November 1, 1984, the Tribune would cease its forty-year old practice of using the Union's referral procedures for hiring new and extra employees. (Complaint Exhibit "B"). The company's stated reason for discontinuing the practice was to ensure that all hiring practices would be nondiscriminatory.

On September 7, 1984, Union president William Roberts wrote to the Tribune to protest the company's unilateral discontinuance of the referral system. (Complaint Exhibit "C"). Roberts stated that utilization of the Union callroom had been a "mutually agreed to working condition from the inception of the collective bargaining relationship" and requested that the issue be referred to the Joint Standing Committee for arbitration if informal resolution proved impossible.

On September 11, 1984, the Tribune responded that its use of the callroom was not and had never been a mutually agreed to working condition. (Complaint Exhibit "D"). The Tribune stated that the Joint Standing Committee procedures were inapplicable because the contract was silent on referral procedures and advised the Union to take up further complaints with the CNPA.

On September 27, 1984, the Union notified the CNPA and formally requested a Joint Standing Committee meeting for arbitrating the contemplated action of the Tribune. (Complaint Exhibit "F"). The CNPA took the position that, since the dispute did "not involve any of the provisions contained in the written collective bargaining agreement between the CNPA and [the] union, such matters [could not] be properly entertained or decided by the Joint Standing Committee." (Complaint Exhibit "H"). The Union followed up this letter with a formal demand for arbitration, which was again rejected. (Complaint Exhibits "I" and "J"). In late November, the Union prepared a submission to the American Arbitration Association to resolve both the issue of arbitrability as well as the underlying dispute. (Complaint Exhibits "N" and "O"). The CNPA again declined to arbitrate, (Complaint Exhibit "P"), and this suit followed on December 21, 1984.

## Arbitrability

■ The legal rules underlying this dispute are too well settled to merit extended background discussion. Ever since the *Steelworkers* trilogy,[1] it has been recognized that national labor policy favors arbitration as a means of resolving employee-employer disputes. Accordingly, federal courts have a limited role to play in § 301 suits seeking arbitration, and must uphold the duty to arbitrate wherever the bargaining agreement may reasonably be construed to impose such a duty:

> An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

---

1. *United Steelworkers v. American Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

*United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960).

■ At the same time, however, the duty to arbitrate is contractual in nature, and a party cannot be compelled to arbitrate a grievance absent some voluntary agreement to do so. *Id.* at 582, 80 S.Ct. at 1353. *See also Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 374, 94 S.Ct. 629, 635, 38 L.Ed.2d 583 (1974). Stressing this language, defendants argue that they cannot be required to arbitrate a dispute which did not arise until after the bargaining agreement in question expired.

■ Whatever the logical merit of defendants' position, applicable precedent establishes the opposite rule. In *Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionery Workers Union*, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977), the Supreme Court held that, absent an arbitration clause which expressly excludes disputes based on events arising after termination of the contract, survival of the duty to arbitrate should be presumed. *Id.* at 253–55, 97 S.Ct. at 1073–74. *See United Steelworkers v. Fort Pitt Steel Casting Division—Conval-Penn, Inc.*, 635 F.2d 1071, 1075 (3d Cir.1980), *cert. denied*, 451 U.S. 985, 101 S.Ct. 2319, 68 L.Ed.2d 843 (1981) (agreement to arbitrate will survive contract expiration absent express language or "clear implication" otherwise). Thus, under *Nolde Bros.*, the fact that a contract dispute arises after the contract has expired is irrelevant to the duty to arbitrate; the proper question is instead whether the dispute is arguably within that contract's arbitration clause.

Defendants have cited several recent cases in which the courts refused to order arbitration of disputes which arose after the term of the relevant bargaining agreement had expired. Every one of those cases, however, was decided on a basis

immaterial to the present lawsuit. In *O'Connor Co., Inc. v. Carpenters Local Union No. 1408*, 702 F.2d 824 (9th Cir. 1983), the Court held *Nolde Bros.* distinguishable because the dispute sought to be arbitrated arose under a master agreement which the company had never executed. In *Diamond Glass Corp. v. Glass Warehouse Workers & Paint Handlers Local Union 206*, 682 F.2d 301 (2d Cir.1982), and *Milwaukee Typographical Union No. 23 v. Madison Newspapers, Inc.*, 444 F.Supp. 1223 (W.D.Wis.1978), *aff'd*, 622 F.2d 590 (7th Cir.1980), the respective plaintiff unions refused to provide any information which would indicate that their dispute arose under the expired agreement. Two other cases cited by defendants, *Cement Masons Health & Welfare Trust Fund v. Kirkwood-Bly, Inc.*, 520 F.Supp. 942 (N.D. Cal.1981), *aff'd*. 692 F.2d 641 (9th Cir.1982), and *Laborers Health & Welfare Trust Fund v. Hess*, 594 F.Supp. 273 (N.D.Cal. 1984), do not even involve arbitration and are therefore altogether irrelevant.

■ Defendants also cite *General Warehousemen and Employees Union Local 636 v. J.C. Penney Co.*, 484 F.Supp. 130, 137 (W.D.Pa.1980) for the proposition that the Union must allege some facts to show that the parties agreed to extension of the arbitration clause at issue. In *J.C. Penney*, however, the bargaining agreement expressly limited the grievance mechanism to disputes "arising under and during the term of the agreement." Stressing that *Nolde Bros.* stated a rule of presumptive and not absolute continuation, the Court found the above language sufficient to rebut the presumption and to require independent evidence of an agreement to extend the contract. Since the contract between the parties here contains no similar exclusionary clause, no such further evidence is required.[2] The sole question is

---

**2.** *J.C. Penney* is relevant insofar as plaintiff argues that the Tribune's practice of maintaining existing conditions during renewal negotiations constitutes a promise to extend the contract. In *J.C. Penney,* the Court held that a company promise not to make unilateral changes in the

terms and conditions of employment absent an impasse in renewal negotiations was no more than a verbalization of the company's legal obligations under § 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), and not a promise to extend the contract. 484 F.Supp. at

therefore whether the Agreement is susceptible of an interpretation which would make the present dispute arbitrable.

Defendants contend that the dispute over referral procedures is non-arbitrable because the contract nowhere contains explicit provisions referring to these procedures, and the parties have specifically limited grievances subject to arbitration to those which arise out of specific contract terms. As a necessary corollary to this argument, defendants insist that only the Joint Standing Committee clause is at issue in this dispute. While the Union does not appear to challenge this position, discontinuance of the referral system can be viewed as the Tribune's proposal to amend the contract and the parties' failure to reach agreement on the issue would constitute a "difference" which is arbitrable under the "interest arbitration" clause.[3] However, the Union is not basing its position on the interest arbitration clause, but on the Standing Joint Committee provisions of the Agreement.

As stated earlier, the Joint Standing Committee provision provides for arbitration of all questions "which may arise as to the construction to be placed upon any of the clauses of this Agreement or any alleged violations thereof, which cannot be settled otherwise." Defendants contend that this clause is limited to arbitration over specific contract terms, so that the silence of the contract on the callroom procedures is therefore fatal to plaintiff's claim. This argument, however, ignores the express language of the Joint Standing Committee clause, which encompasses not only matters of contract construction but also any "alleged violations" of the Agreement.[4] The Union has alleged that the Tribune's forty-year old practice of hiring through the callroom was an implied obligation under the contract, and that the unilateral cancellation thereof is a violation of the Agreement which must be submitted to arbitration. (See Affidavit of William Roberts).

The weakness of defendants' argument is apparent by comparing the Joint Standing Committee provision to the clause concerning "speedy" arbitration. The "speedy arbitration clause" provides for preservation of working conditions pending conciliation but only where such conditions "are set forth in the contract or are the subject matter of agreements arrived at and reviewed by the parties." This contemplates that there could be working conditions not set forth in the contract. Since the Joint Standing Committee is empowered to resolve all contract questions other than those qualifying for speedy arbitration, the latter clause cannot reasonably be confined to disputes over specific contract terms, lest the entire clause be redundant.

Even ignoring the comparative language of the two provisions, defendants err in insisting that contractual silence is a defense to refusing to arbitrate a contract

---

137. The Tribune's post-expiration conduct of maintaining present conditions similarly falls short of an express promise to keep the expired contract in full force and effect. Accordingly, the court will rely solely on the terms of the 1981–1984 agreement to determine the issue of arbitrability.

3. Interest arbitration clauses have been held subject to the *Nolde Bros.* rule of presumptive survival. *Hotel & Restaurant Employees and Bartenders Union, Local 703 v. Williams,* 752 F.2d 1476 (9th Cir.1985). While such survivability may offend public policy concerns where the disputed contract terms involve nonmandatory subjects of bargaining, *see NLRB v. Sheet Metal Workers Int'l Ass'n, Local Union No. 38,* 575 F.2d 394, 398 (2d Cir.1978), that problem does not affect the present case.

4. Defendants apparently construe the phrase "alleged violations thereof" to mean violations of the aforesaid "clauses," and not violations of the Agreement. The court rejects this interpretation as inconsistent with the presumptions favoring arbitrability. *See Randall v. Lodge No. 1076, International Association of Machinists and Aerospace Workers,* 648 F.2d 462, 467 (7th Cir.1981) (any doubts as to whether a contract excludes issues from arbitration must be resolved in favor of inclusion). However, for the reasons stated elsewhere in this opinion, the dispute would be arbitrable even accepting defendants' proposed interpretation of the Joint Standing Committee clause.

dispute. In *Warrior & Gulf,* the Supreme Court held that a promise to arbitrate differences "as to the meaning and application of the provisions" of a bargaining agreement encompassed a dispute over the employer's contracting out of maintenance work, despite the agreement's silence on the subject. The language of the Court is instructive for the present case:

> [I]t is not unqualifiedly true that a collective-bargaining agreement is simply a document by which the union and employees have imposed upon management limited, express restrictions of its otherwise absolute right to manage the enterprise, so that an employee's claim must fail unless he can point to a specific contract provision upon which the claim is founded. There are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights and duties.... Within the sphere of collective bargaining, the institutional characteristics and the governmental nature of the collective-bargaining process demand a common law of the shop which implements and furnishes the context of the agreement.

363 U.S. at 579–80, 80 S.Ct. at 1351–52 (quoting Cox, *Reflections Upon Labor Arbitration,* 72 Harv.L.Rev. 1482, 1498–99 (1959). Under the rule of *Warrier & Gulf,* the continued past practice of utilizing union referrals for hiring is part of the contract although not expressed in it, and therefore subject to the contractual provisions governing arbitration.

### Attorneys' Fees

■ Plaintiff has requested attorneys' fees based on defendants' unjustified refusal to arbitrate. The opinions cited by plaintiff all contain express factual findings that the employer had refused to arbitrate "without justification or for frivolous reasons" so as to justify fees on grounds of bad faith. *See, e.g., International Association of Machinists v. Texas Steel Co.,* 538 F.2d 1116 (5th Cir.1976), *cert. denied,* 429 U.S. 1095, 97 S.Ct. 1110, 51 L.Ed.2d 542 (1977). While defendants' arguments for refusing to arbitrate have all been rejected, the court did not find them to be so frivolous that a finding of bad faith should be inferred. Accordingly, the request for attorneys' fees is denied.

### CONCLUSION

The defendants' motion to dismiss is denied, and the plaintiff's motion for summary judgment is granted. The plaintiff's request for attorneys' fees is denied.

It is so ordered.