**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PINE VALLEY DIVISION OF ETHAN ALLEN, INC., Respondent.**

No. 75–2339.

United States Court of Appeals, Fourth Circuit.

Argued June 9, 1976.

Decided Nov. 8, 1976.

Aileen Armstrong, N.L.R.B. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., John H. Ferguson, Sandra Shands Elligers, Attys., N.L.R.B., on brief, for petitioner.

J. W. Alexander, Jr., (John O. Pollard, Blakeney, Alexander and Machen, on brief) Charlotte, N. C., for respondent.

Before HAYNSWORTH, Chief Judge, and BUTZNER and WIDENER, Circuit Judges.

HAYNSWORTH, Chief Judge:

The National Labor Relations Board seeks enforcement of an order requiring the Pine Valley Division of Ethan Allen, Inc., as a successor employer, to comply with the terms of a labor contract, binding upon a predecessor employer, until its expiration date, including the payment of certain vacation benefits, to bargain with the Union as the representative of its employees, and to place unretained employees on a preferential hiring list.

The respondent, Ethan Allen, is a manufacturer of wooden furniture. At Old Fort, North Carolina, it operates a large, modern plant in which dimension stock purchased from others is processed, assembled and finished as furniture ready for sale to the ultimate consumer. A principal supplier of its dimension stock had been Morgan Manufacturing Company, but in 1970 Morgan had been acquired by Drexel, a competitor of Ethan Allen, and Drexel had informed Ethan Allen of a progressive reduction in the supply of such material available for sale to Ethan Allen. Thus, in 1972 and the early part of 1973 Ethan Allen was looking for an alternate source of supply of what, to it, was its raw material. In September 1972 it placed substantial orders for rough dimension parts with Hardwood Corporation of America. Additional orders were placed with that company in April and May of 1973.

Hardwood had been the operator of a plant at Asheville, North Carolina, some twenty-eight miles from Old Fort, in which it produced dimension stock. In the summer of 1972 it began a pilot operation for the conversion of some of its dimension stock into finished furniture. At about the same time, Hardwood's financial situation began to deteriorate, and in the spring of 1973 the deterioration was accelerating. By April 1973 Hardwood was in default on various obligations to the North Carolina National Bank and its affiliates. The bank declined to make further advances and sent two of its officers to the premises to supervise the operation of the business or its liquidation. The bank, which had a first lien on the real estate, machinery and equipment was anxious to effect a sale of the entire plant as a going concern. Hence, it sought to keep the plant in operation while potential buyers were contacted.

On May 14, 1973, Ethan Allen and the bank concluded a verbal agreement of purchase and sale of the plant, and Ethan Allen's Southeastern Regional Manager had a notice posted on the bulletin board of the Asheville plant informing the employees that they were then affiliated and owned by Ethan Allen, and that they need no longer be concerned about the continued operation of the plant or their future. The next day, however, May 15, immediate consummation of this informal purchase agreement was frustrated when other creditors

of Hardwood filed an involuntary petition in bankruptcy, foreclosing a voluntary transfer of title to the plant from Hardwood to the bank and from the bank to Ethan Allen. The bank and Ethan Allen then turned to an oral lease arrangement under which it was agreed that the employees of the Asheville plant would continue to be employees of Hardwood until the arrangement between the bank and Ethan Allen was formalized. This arrangement was reduced to writing on June 18, 1973. That writing recited that Ethan Allen, in May, had been placed in joint possession, with the bank, of the plant with the consent of Hardwood for the purpose of permitting Ethan Allen to continue the plant's operation. Reference was made to Ethan Allen's purpose to purchase the plant, and the bank undertook to proceed as rapidly as may be with foreclosure proceedings and to sell the plant to Ethan Allen, if the bank became its owner as a result of the foreclosure sale. This arrangement continued until June 29, when the plant was shut down to permit the removal of machinery and equipment which had been purchased by others at the foreclosure sale, which had been purchased by the bank, sold to Ethan Allen, and by it resold to others, and still further machinery which was transferred by Ethan Allen to its Old Fort plant.

On June 29, the employees were assembled and told that the plant would be closed until July 10 when it would reopen with new employees. The employees were told that they might apply for such employment. They were also told that their vacation benefits were the obligation of Hardwood, that Ethan Allen had unsuccessfully attempted to persuade the bank to make such payments and that, with respect to such benefits, the employees were in the position of other creditors of the bankrupt, Hardwood. There was a provision for the payment of such benefits in a contract between Hardwood and a local of the Upholsterers' International Union of North America which was in effect at the time.

When the plant was reopened on July 10, fifty-four of the one hundred and four for-mer employees (as of June 29) were reemployed. Nine others were employed later, a total of sixty-three of the one hundred and four former employees, and these sixty-three represented the entire complement of the plant. After July 10, however, only the sawmill and the rough dimension department were operating, all other operations having been terminated. By July 10, Ethan Allen had become the record owner of the entire plant and of the machinery and equipment remaining in it.

Whether or not Ethan Allen was the successor employer turns largely upon when the succession took place. If it took place on May 14 when Ethan Allen first assumed responsibility for the plant's operation, succession is readily apparent; if it occurred on July 10 when it reopened after Ethan Allen had become its legal owner, as Ethan Allen contends, a much more difficult question would be presented. We think the Board reasonably concluded that the succession occurred on May 14.

When, on May 14, Ethan Allen, through its Southeastern Regional Manager, assumed general responsibility for the operation of the plant and informed all of the employees that they had become affiliated with Ethan Allen, there was an expectation that Ethan Allen would become the legal owner of the plant within a short period. This expectation was frustrated the next day with the filing of the petition in bankruptcy, and the parties resorted to a verbal, and then to a written, lease arrangement. The written agreement of July 18, however, clearly recites the parties' intention that the bank would bid in the property at the foreclosure sale and that Ethan Allen would purchase it from the bank at a set price, an intention which would be defeated only if some one at the foreclosure sale outbid the bank. In the interim between May 15 and June 29, Ethan Allen was operating the plant as its expectant owner and for its own account. It is true that in late May there was an understanding between the bank and Ethan Allen that the employees would remain employees of Hardwood, but this was true only in a technical sense. The

bank had been handling the payrolls for Hardwood and it continued to handle them, making the necessary withholding and FICA deductions, as well as deducting union dues for those who had authorized such deductions, and preparing the net pay checks for the employees. The bank immediately charged Ethan Allen with all such payroll costs, however, and was promptly reimbursed by Ethan Allen. The funds for the wages and all other payroll costs were supplied by Ethan Allen, which must be regarded as the real employer of the employees. Except that the plant manager and lesser supervisors were former employees of Hardwood, Hardwood had nothing to do with the operation of the plant, at least after the end of May, and the operation of the plant was not at the risk of the bankrupt after May 14.

While Ethan Allen retained the former plant manager, it placed one of its own supervisors in direct management of the rough lumber operation. It sent one of its own employees to serve as personnel manager, and the plant manager, himself, reported to and took direction from the Regional Manager.

It was never contemplated that Ethan Allen would purchase inventories or supplies, except as they were consumed in its operation. The bank billed Ethan Allen for raw materials, including kiln dried lumber, put into process by Ethan Allen, and it received monthly payments from Ethan Allen tantamount to rent. Otherwise, with one small exception to be mentioned, operation of the plant after May 14 was entirely by Ethan Allen for its benefit. Neither the bank nor the bankrupt had any fear of incurring an operating loss or a hope of making operating profits.

Before May 14, Hardwood, or Hardwood and the bank, had closed down a pallet operation, and they were in the process of closing the furniture assembly, finishing, packaging and shipping departments. Final closure of those departments waited only the filling of orders for two customers of Hardwood's. Employees of the plant completed those orders within ten calendar days after May 14, and Ethan Allen charged the bank with the payroll costs for that work. The work in all other departments, however, was by Ethan Allen for Ethan Allen's account.

■ We think that the Board went too far in concluding that Ethan Allen had closed the furniture assembly, finishing, packaging and shipping departments. Closure of those departments had been predetermined before Ethan Allen arrived on the scene, and there is no suggestion that it ever had any interest in acquiring a furniture manufacturing facility to compete with its Old Fort plant or to supplement its capacity. What it sought was a supply of dimension stock.

While, after July 10, the Asheville plant produced only rough dimension stock, not finished dimension stock, the elimination of the departments converting rough dimension stock to finished was Ethan Allen's, and the matter of succession should be viewed with those departments in operation. The elimination of those departments may explain why a considerable amount of machinery purchased by Ethan Allen from the bank was transferred from the Asheville plant to the Old Fort plant while the Asheville plant was shut down between June 29 and July 10. It may have been economic necessity or great desirability to concentrate a given department in one plant, but if the succession occurred on May 14, as the Board reasonably found, the view must encompass the current operation of those later eliminated departments.

Under these circumstances, the Board reasonably found that all the criteria for successorship were met.

Treating the furniture finishing business as substantially terminated on May 14, as it was, there was continuity in the operation of the remaining business. It was in the same plant in which it had formerly been conducted, with the same jobs, employees and working conditions. There was substantial continuity of supervision and, of course, the same equipment and machinery were employed. The same parts were produced. *See NLRB v. Burns International*

*Security Services,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61.

■ Moreover, there was reliance by the Board upon negotiations between the president of the local union and the plant manager during the period of May 14 to June 29. As we have mentioned, union dues were deducted and the bank made remittances to the union's welfare fund. There is some disclaimer of knowledge by Ethan Allen of these deductions and remittances, but it must have received the payroll accounts from the bank upon which it made full reimbursement. In all events, there was enough evidence of recognition of the union contract's existence and continuance during the period May 14 to June 29 to support the Board's finding that there had been an adoption by Ethan Allen of the contract, its benefits and obligations.

■ Finally, Ethan Allen asserts that on July 10 the Asheville plant became a part of a single unit composed of the two plants which, together, processed logs into finished furniture. The earlier separate ownership of the two plants, the separate bargaining history and the presence of a current labor contract for a unit composed of the employees of the Asheville plant, however, warranted the Board's conclusion that the Asheville plant's identity as a separate unit continued.

After thorough consideration of all of the contentions of the employer, we conclude that the Board's findings, with the exception of the closure of the furniture assembly, finishing, packaging and shipping departments, are supported by substantial evidence which, in turn, support its conclusions of law and its remedial order.

*ENFORCEMENT GRANTED EXCEPT INSOFAR AS ETHAN ALLEN WAS HELD RESPONSIBLE FOR THE CLOSURE OF THE FURNITURE ASSEMBLY, FINISHING, PACKAGING AND SHIPPING DEPARTMENTS.*