**John R. CARTER, d/b/a Bay City Foundry Co., Plaintiff,**

**v.**

**CMTA–MOLDERS & ALLIED WORKERS HEALTH & WELFARE TRUST, a trust fund, et al., Defendants.**

**No. C–79–0248–WWS.**

United States District Court,
N. D. California.

April 28, 1980.

Littler, Mendelson, Fastiff & Tichy, San Francisco, Cal., for plaintiff.

Sedgwick, Detert, Moran & Arnold, San Francisco, Cal., for defendants.

## MEMORANDUM OF OPINION AND ORDER

WILLIAM W SCHWARZER, District Judge.

This is an action to recover contributions made by the plaintiff employer to two employee trust funds, the CMTA-Molders & Allied Workers Health & Welfare Trust and the CMTA-Molders & Allied Workers Pension Trust (hereafter "the Trust Funds"). The Court has jurisdiction under Section 302 of the Labor Management Relations Act of 1947 ("the LMRA") (29 U.S.C. § 186(e)). The parties have filed cross-motions for summary judgment. The Court concludes that no material facts are in dispute and that defendants are entitled to judgment as a matter of law.

Plaintiff John R. Carter is the owner of Bay City Foundry Co. which makes sand castings of engineering parts. Bay City is a sole proprietorship. In November, 1973, Carter acquired the assets of Bay City from George Romero. Romero had entered into a collective bargaining agreement with Local 164 of the Molders and Allied Workers Union, AFL-CIO, some years earlier. He had also executed two agreements under which he became a contributing employer and subscriber of the two Trust Funds. Romero made regular contributions to the Trust Funds in accordance with the terms of the agreements until he sold the business to Carter in 1973.

Carter took over the business unaware of these agreements. He retained four of the six persons then employed by Bay City. He told these employees that they would continue to be paid at the rates then in effect and that their pension and health and welfare benefits would be maintained at the same levels as before. Shortly after the acquisition, Carter began receiving monthly invoices from the Trust Funds and paid the amounts billed, in part by deduction from pay checks and in part by direct contribution.

Representatives of the Trust Funds asked Carter from time to time thereafter to execute subscriber agreements which he declined to do because he "didn't feel legally obligated to sign them." Nevertheless he continued to make monthly contributions in accordance with the billings of the Trust Funds as a "convenience." In July, 1978, following a vote by the employees, the union was decertified. Carter then ceased to make further contributions to the Trust Funds. His last payment, made in July, 1978, covered amounts due until April, 1978. No payment was made for the period from April until the date of decertification.

Carter now seeks a refund from the Trust Funds of the contributions he made contending that they violated Section 302(c)(5)(B) of the LMRA.[1] Section 302

---

1. The relevant provisions of the statute are as follows:

    (a) It shall be unlawful for any employer . . . to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

    (1) to any representative of any of his employees who are employed in an industry affecting commerce; . . .

        \*     \*     \*     \*     \*     \*

    (c) The provisions of this section shall not be applicable . . . (5) with respect to money or other thing of value paid to a trust fund established by such representative, for

makes it unlawful for an employer to pay money to any employee representative. Section 302(c)(5)(B) provides an exception for payments to a trust fund for the benefit of employees provided that

> the detailed basis on which such payments are to be made is specified in a written agreement with the employer . . .

In the absence of such a written agreement between the employer and the trust fund, contributions are unlawful. *Moglia v. Geoghegan*, 403 F.2d 110, 116 (2d Cir. 1968), *cert. denied* 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969); *Thurber v. Western Conference of Teamsters Pension Plan*, 542 F.2d 1106, 1108 (9th Cir. 1976).

Relying on these decisions, Carter argues that inasmuch as he never executed a written agreement obligating him to make contributions to the Trust Funds, his contributions were unlawful and must therefore be returned to him.[2] The issue before the Court is whether Carter upon acquisition of Bay City became obligated to make contributions under the agreements previously executed by Romero. If he did, the written agreement with the employer required by Section 302 existed and the contributions must be held to have been lawful.[3]

Although a number of recent decisions have considered the obligations of so-called "successor employers" under collective bargaining agreements, none has dealt with the particular issue before the Court, i. e., under what circumstances a successor employer is bound by his predecessor's agreement to contribute and subscribe to employee Trust Funds. In the absence of direct authority, it is necessary to review the decisions arising under collective bargaining agreements for such guidance as they may provide.

In the first of these decisions, *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), the Supreme Court held that the disappearance of the employer through a corporate merger did not extinguish the obligation of the successor corporation to arbitrate disputes under the former corporation's collective bargaining agreement, and that the successor could be compelled to arbitrate so long as there was "substantial continuity of identity in the business enterprise." 376 U.S. at 551, 84 S.Ct. at 915.

In *NLRB v. Burns Security Services*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), Burns had succeeded Wackenhut as the contractor to provide security protection at a Lockheed plant. The NLRB had previously certified the unit of security personnel as an appropriate bargaining unit and Wackenhut had entered into a collective bargaining agreement. When Burns succeeded Wackenhut as the low bidder, the majority of guards it employed were former employ-

---

the sole and exclusive benefit of the employees of such employer, . . . Provided, That . . . (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer . . .

**2.** There may be a separate and distinct question whether it is appropriate to enforce Section 302 by requiring trust funds to return to employers contributions which did not comply with Section 302. The Court is aware of no reported decisions requiring such refunds or considering this question. There are grounds for skepticism that this is an appropriate method for enforcing the statute, especially when contributions have been made routinely over several years by both employer and employees and the trust funds have paid employee claims. Moreover, the remedial purposes of Section 302 would be ill-served if an employer, by compelling refunds of contributions made over a period of years, could jeopardize the future pension

rights of employees who have in the past relied on the regularity of the contributions. *Cf. Lewis v. Seanor Coal Co.*, 382 F.2d 437, 443 (3d Cir. 1967). *But see, also, Moglia v. Geoghegan*, above. In view of the disposition of this case, however, the Court has not addressed this question.

**3.** That issue must be distinguished from issues arising out of the subsequent conduct of the parties. Thus, Carter's continuing to make contributions for five years after the acquisition while refusing to sign agreements is irrelevant to the question whether upon acquiring the business he became obligated under the written agreements. If he did not become obligated at that time, the illegality of his contributions could not be cured by subsequent ratification or consent or by estoppel. *See, Moglia v. Geoghegan*, above.

ees of Wackenhut in the bargaining unit. The Court upheld a Board order requiring Burns to bargain with the union representing that unit but set aside so much of the order as required Burns to comply with the substantive terms of the prior collective bargaining agreement. The Court distinguished *Wiley* on the ground that it "arose in the context of a § 301 suit to compel arbitration, not in the context of an unfair labor practice proceeding where the Board is expressly limited by the provisions of § 8(d)", i. e., that the "obligation to bargain does not compel either party to agree . . ." 406 U.S. at 285, 92 S.Ct. at 1581. *Burns* moreover, as the Court pointed out, did not involve a merger or sale of assets but the transfer of a service contract from one firm to its competitor, with the successful bidder hiring a majority of the loser's employees. 406 U.S. at 286, 92 S.Ct. at 1581. With respect to "a merger, stock acquisition . . or assets purchase, [the Court further observed] the Board might properly find as a matter of fact that the successor had assumed the obligations under the old contract." 406 U.S. at 291, 92 S.Ct. at 1584.

*Burns* was followed by *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), holding that the Board properly ordered the purchaser of a business, who knew that his predecessor had committed an unfair labor practice, to comply with a reinstatement and backpay order entered subsequent to the acquisition. The Court found *Wiley*, rather than *Burns*, to be controlling, reasoning that where the employer has acquired the substantial assets of its predecessor and continued without interruption or substantial change the business operations of the predecessor, the policies of the labor laws intended to promote industrial peace, the free exercise of employee rights guaranteed by the Act, and the protection of victimized employees support the imposition on the successor employer of sanctions to remedy unfair labor practices affecting the continuing work force.

Finally, in *Howard Johnson Co. v. Hotel Employees*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), the Court was once again faced with a Section 301 action to compel

arbitration. Howard Johnson had acquired the personal property used by the prior employer in connection with the operation of a restaurant and motor lodge and had leased the real estate. It specifically refused to recognize or assume any existing labor agreement. Prior to the transfer of the property and operations to Howard Johnson, the seller gave notice of termination to all employees. Howard Johnson hired its own work force of 45 employees of whom only 9 had previously been employed in the bargaining unit. The Court held that *Wiley* was distinguishable and did not warrant imposition of a duty to arbitrate under the prior agreement. In reaching that conclusion it relied primarily on the fact that in *Wiley* the surviving corporation had retained all of the employees of the disappearing corporation, resulting in "substantial continuity of identity in the business enterprise." 417 U.S. at 258–59, 94 S.Ct. at 2241–42. Howard Johnson, by way of contrast, had selected its own work force, over eighty percent of which was new. The effect of imposing a duty to arbitrate would have been to place in issue the right to replace the former employees, in violation of *Burns* which recognized the right of the purchaser of a business not to hire the employees of the former employer.

In concluding that under the circumstances of the case, the successor employer had no duty to arbitrate, the Court in a footnote, made the following illuminating statement:

The Court of Appeals stated that "[t]he first question we must face is whether Howard Johnson is a successor employer," [*Detroit Loc. Jt. Exec. Bd., etc. v. Howard Johnson Co., Inc.*] 482 F.2d [489], at 492, and, finding that it was, that the next question was whether a successor is required to arbitrate under the collective-bargaining agreement of its predecessor, *id.*, at 494, which the court found was resolved by *Wiley*. We do not believe that this artificial division between these questions is a helpful or appropriate way to approach these problems. The question whether Howard Johnson is a "suc-

cessor" is simply not meaningful in the abstract. Howard Johnson is of course a successor employer in the sense that it succeeded to operation of a restaurant and motor lodge formerly operated by the Grissoms. But the real question in each of these "successorship" cases is, on the particular facts, what are the legal obligations of the new employer to the employees of the former owner or their representative? The answer to this inquiry requires analysis of the interests of the new employer and the employees and the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc. There is, and can be, no single definition of "successor" which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others. 417 U.S. at 262–63 n.9, 94 S.Ct. at 2243 n.9.

The question before the Court, therefore, is whether Carter had a legal obligation under the Trust Fund agreements to continue to make contributions. The answer must be found in an analysis of the interests of the employees and the employer, the particular obligation involved, and the relevant policies of the labor laws in light of the particular facts of the case.

■ The agreements in issue here are respectively the welfare plan subscriber's agreement, executed December 6, 1964, and the contributing employer's agreement with the pension trust, executed August 25, 1960. (Ex. D to Lederman Declaration) Each agreement was executed by Bay City Foundry as the employer, signed "by Geo. Romero, Owner." Each provided that contributions were to be made at the rates and in accordance with the collective bargaining agreement between California Metal Trades Association and International Molders and Allied Workers Union, AFL-CIO, and Local 164 "for the period provided in such Agreement and thereafter until written notice revoking the [agreement] is given to the [trust]." The agreements were silent respecting the obligations of successors or assigns of the employer.

The agreement of sale between Carter and Romero, executed in October, 1973, was also silent with respect to assumption of contractual or other liabilities. It provided for the sale of the "business, together with its furniture, fixtures, tools, equipment, name, goodwill, inventory of raw materials and work in process." The underlying real estate was leased to Carter for a term of five years, with an option to renew for five years. Claims arising out of the operation of the business prior to the sale were to be paid by the seller. (Ex. 4, Depo. of Carter)

Upon acquiring the business, Carter continued its operations substantially as before. He made the same products at the same location under the same name and continued to service Romero's accounts and customers. He retained the same work force with two exceptions—Romero became a consultant under contract rather than an employee and one employee was terminated.

Carter met with each employee and stated that he would maintain the existing pay rates and would continue to make the same welfare and pension plan deductions and contributions. He continued to maintain the existing payroll and accounting system. He did not execute either a new collective bargaining agreement or new contribution or subscriber agreements.

Although Carter did not expressly assume the obligations of these agreements at the time of the acquisition, neither did he repudiate or reject them at that time. Compare, *Bartenders & Culinary Workers v. Howard Johnson Co.*, 535 F.2d 1160 (9th Cir. 1976). The question to be decided is whether by his conduct he impliedly assumed those obligations.[4] His failure to

4. "The pertinent state law can be summarized as follows:

　Under the law of California and most other jurisdictions, where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor, except where:

terminate the agreements or reject the obligations under them,[5] his retention of the existing work force and his assurances to the employees that he would maintain the contributions and deductions to the Trust Funds, and his maintenance of existing pay rates and payroll systems and procedures, especially when viewed in light of the overall continuity of the business, compel the conclusion that he did. *Cf. Price v. United States*, 599 F.2d 594, 596–97 (4th Cir. 1979); *NLRB v. Pine Valley Division of Ethan Allen, Inc.*, 544 F.2d 742, 746 (4th Cir. 1976).

Neither *Burns* nor *Howard Johnson* preclude that conclusion. The policies underlying those decisions are not implicated here. The freedom of the successor employer to hire its own work force and negotiate new terms of employment is not at issue. Nor is there a conflict here between the rights of former and of newly hired employees. Both decisions recognize, moreover, that the successor may expressly or impliedly assume the obligation of existing labor agreements. 417 U.S. 261, 264–65, 94 S.Ct. 2236, 2244, 41 L.Ed.2d 46.[6]

■ Nor does vindication of the policies underlying Section 302 require a different conclusion. The purpose of that section was to curb the abuses found in funds created and maintained by contributions exacted from employers but administered by union officials without obligation to account to contributors or employees. *Moglia v. Geoghegan*, 403 F.2d at 116–17. There is no risk that this purpose would be frustrated by holding that the successor employer had impliedly assumed the obligations under the subscriber and contribution agreements. These written agreements specified the detailed basis on which payments were to be made by Bay City.[7] By their terms, they remained in effect until terminated. Bay City continued its business and operation substantially unchanged after the acquisition. Thus the statutory objectives of disclosure and accountability are fully realized.

For the foregoing reasons, plaintiff's claim for refund must be rejected as a matter of law. For the same reasons, defendants are entitled to recover the unpaid balance of contributions due for the period from April to July 1978, when the agreements were terminated. The parties shall bear their own costs. Counsel for defendants is directed to submit forthwith a form of judgment in conformity herewith.

IT IS SO ORDERED.

(1) the purchaser expressly or impliedly agrees to assume such debts; . . . *Kloberdanz v. Joy Manufacturing Co.*, 288 F.Supp. 817, 820 (D.Colo.1968) . . ." *Acheson v. Falstaff Brewing Corp.*, 523 F.2d 1327, 1329–30 (9th Cir. 1975); *See Ray v. Alad Corporation*, 19 Cal.3d 22, 28, 560 P.2d 3, 7, 136 Cal.Rptr. 574, 578 (1977).

5. Even though Carter did not know of the existence of the agreements, he knew that contributions were being made to the Trust Funds and promised to continue to make them and he received billings from the Funds and paid them. *See Lewis v. Cable,* 107 F.Supp. 196 (W.D.Pa. 1952). *See also,* n.6, below.

6. This case therefore is also to be distinguished from *Bartenders & Culinary Workers v. Howard Johnson Co.*, above. There the purchaser continued the operations of the business with no substantial change. retaining the entire work force. It did however give notice at the time of the acquisition that it refused to recognize the union or be bound by the collective bargaining agreement. The union sued under Section 301 for specific performance and breach of the collective bargaining agreement. The court affirmed a judgment for defendant, stating that a successor employer "may not [be ordered] to abide by the substantive provisions of a collective bargaining contract negotiated by its predecessor but not agreed to or assumed by the successor employer." 535 F.2d at 1162. Inasmuch as Carter made no attempt at the time of the acquisition to reject the obligations of the agreements, the *Bartenders* case does not control. The differences in the claims asserted, moreover, require independent analysis of the case before the Court.

7. The Trust Fund agreements are sufficient to satisfy the requirements of Section 302 without the necessity for a binding collective bargaining agreement. *Hinson v. NLRB*, 428 F.2d 133, 139 (8th Cir. 1970); *Denver Metro. Assn. v. Journeyman Plumbers*, 586 F.2d 1367, 1373 (10th Cir. 1978).