**UNITED STATES CAN COMPANY, Petitioner, Cross-Respondent,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.**

**United Steelworkers of America, AFL–CIO–CLC, Intervening Respondent, Cross-Petitioner.**

**Nos. 92–1401 and 92–1714.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 21, 1992.

Decided Jan. 28, 1993.

---

Condon A. McGlothlen, Rody P. Biggert (argued), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for petitioner.

Elizabeth Kinney, Chicago, IL, Aileen A. Armstrong, Linda J. Dreeben (argued), Lisa Richardson Shearin, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, DC, for respondent.

Richard J. Brean (argued), United Steelworkers of America, Asst. Gen. Counsel, Pittsburgh, PA, for intervenor-respondent.

Before CUDAHY and EASTERBROOK, Circuit Judges, and WILL, Senior District Judge.*

EASTERBROOK, Circuit Judge.

Inter–American Packaging, Incorporated, is in the container business. One of its subsidiaries, United States Can Company, operated five packaging plants scattered throughout the United States when, in 1987, it acquired four additional plants from the "general packaging" division of Continental Can Company. Continental had a master agreement with the United Steelworkers of America, which represented many of its employees—and also represented the workers at U.S. Can's plants. Continental's master agreement, effective until February 1989, called for multi-plant bargaining (the NLRB had certified a multi-plant unit) and gave workers laid off for more than 30 days or dismissed on the closure of a plant preference in hiring at other plants (the Inter–Plant Job Opportunity Program, which the parties call "IPJO").

Continental formed a subsidiary, CCC Series 200, Inc. ("Series 200"), to own the assets and liabilities of its general packaging plants. Inter–American formed a subsidiary that purchased the stock in Series 200. Next, U.S. Can was merged into Series 200. Inter–American's subsidiary, having paid Continental the agreed consideration, dissolved, leaving Inter–American the sole stockholder in Series 200, which was immediately renamed United States Can Corporation. As a matter of corporate law, then, Series 200 acquired U.S. Can's five plants, and Inter–American acquired all of the stock in this nine-plant firm. Continental assumed all of the pension liabilities of its former subsidiary. Arranging the transaction in this way produced substantial tax benefits.

As one would expect, U.S. Can operated the four former Continental plants much as if nothing had happened. It did not tell the employees that they had to seek jobs with the new owner. There was no closing, and no new (immediate) owner—although there was a new parent corporation. Closing the plants and inviting applications for employment would have been not only inappropriate to the form of the transaction but also potentially costly. Treating the deal as a sale of assets could well have triggered severance pay and pension benefits connected with a shutdown. See *Allied Industrial Workers Local 879 v. Chrysler Marine Corp.*, 819 F.2d 786 (7th Cir.1987).

Inter–American decided to apply its labor relations policies to the newly acquired plants. U.S. Can had generally friendly relations with labor but resisted multi-plant bargaining. Collective bargaining at U.S. Can's original five plants proceeded plant-by-plant. When it took over the management of the four plants from Continental, U.S. Can invited local union officials to bargain. Letters sent on May 14, 1987, the day after the change in ownership, to the president of each local union said, in part:

> [W]e need to meet as soon as possible to put in place a formal collective bargaining agreement with Local [number] of the U.S.W.A. As you are the bargaining representative for these new employees of U.S. Can Company at [plant], I request that we meet with you and your local plant bargaining committee at a mutually convenient time to discuss the

* Hon. Hubert L. Will, of the Northern District of Illinois, sitting by designation.

terms and conditions of employment and negotiate a collective bargaining agreement between your union and U.S. Can Company. In the interim, the terms and conditions including wages, benefits and working conditions as they presently exist under the collective bargaining agreement with the Continental Can Company shall remain in effect.

Informed by representatives of the parent union that bargaining must occur in a multi-plant unit, U.S. Can balked. Under instructions from the parent union, the presidents of the locals refused to bargain separately; no single-plant agreements were reached. Representatives of U.S. Can and the parent union met sporadically until August 20, 1987, after which they made no further efforts to bridge the gaps separating their positions. Inter–American's insistence on separate bargaining also meant that U.S. Can refused to implement the Inter–Plant Job Opportunity Program, one of the features of a multi-plant unit. While the plants were under Continental's ownership, the IPJO was a paper program. The administrative law judge wrote: "[B]efore the acquisition, IPJO was rarely invoked; only one such transfer occurred and that took place some 15 years ago." The program has increased in significance because U.S. Can has closed three of the four plants acquired from Continental. Employees who sought preferential hiring elsewhere were told that "there is no such thing as IPJO for U.S. Can employees." If U.S. Can had to continue the program until February 1989 (and thereafter until bargaining to impasse with the union), employees who could have been hired at the remaining plant would be entitled to jobs and back pay.

An administrative law judge determined that U.S. Can violated § 8(a)(5) and (1) of the NLRA, 29 U.S.C. § 158(a)(5) and (1), by refusing to bargain with the union in the multi-plant unit and refusing to implement the terms of the master agreement regarding the IPJO. Because only one of the original four plants remains, the multi-plant-unit question has no continuing importance. U.S. Can accepted the administrative law judge's decision on that subject, the Board entered the recommended order, 305 N.L.R.B. No. 178 (1992), and we grant the Board's request for summary enforcement on that question, which U.S. Can has not addressed in its briefs here.

Two subjects were contested before the Board: first, whether the charge was timely; second, whether U.S. Can adopted the master agreement between the union and Continental. Not until October 1988 did the union file a charge specifically protesting the disappearance of the IPJO. The Board concluded that this amended charge is "closely related" to and hence takes the date of the original charge in January 1988 complaining about U.S. Can's refusal to recognize and bargain with a multi-plant unit. The January 1988 charge was itself timely—that is, filed within six months of the unfair labor practice, see § 10(b) of the Act, 29 U.S.C. § 160(b)—because not until August 20, 1987, did U.S. Can make clear that it would bargain only plant-by-plant.

Because the six months do not begin until "the victim of an unfair labor practice receives *unequivocal notice* of a final adverse decision", *Esmark, Inc. v. NLRB*, 887 F.2d 739, 746 (7th Cir.1989) (italics in original), substantial evidence supports the Board's selection of August 20 as the date on which the claim accrued. Earlier dates could be justified, but the Board was not required to draw the inferences U.S. Can favors. It could, and did, treat the letters of May 14 and the handout of May 26 (discussed below), as a bargaining position, which did not ripen into an unfair labor practice until U.S. Can refused to recede. An amendment to a charge relates back to an earlier charge to which it is "closely related." *NLRB v. Overnite Transportation Co.*, 938 F.2d 815, 820–21 (7th Cir. 1991); *NLRB v. Complas Industries, Inc.*, 714 F.2d 729, 733 (7th Cir.1983); *Redd–I, Inc.*, 290 N.L.R.B. 1115 (1988). Substantial evidence supports the conclusion that the refusal to bargain in a multi-plant unit and to implement the IPJO are but two manifestations of a single decision taken by U.S. Can.

Thus we arrive at the only contested substantive issue: whether U.S. Can adopted the master agreement between Continental Can and the Steelworkers Union. This is how the Board phrased the question (to which it answered "Yes"). It is a surprising question, given the form of the transaction. Questions about adoption and the like arise when one firm acquires assets from another and hires the existing labor force. E.g., *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987); *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). Only stock changed hands in the transaction by which Inter-American took control of these four plants. A sale of stock, like a merger, does not affect the contractual obligations of the corporation. *United States Shoe Corp. v. Hackett,* 793 F.2d 161 (7th Cir.1986). Investors may not look through their own corporate structure, recharacterize stock sales as asset sales, and pretend that workers whose employment is continuous "really" were hired afresh on the date of a merger. Although the General Counsel argued that there has been only one employer all along, neither the administrative law judge nor the Board thought it necessary to decide whether labor law distinguishes stock from asset transactions. We must assess the reasons the agency gave. *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). Although perplexed that the NLRB shuns straightforward corporate-law approaches to questions about corporate obligations, see *NLRB v. International Measurement & Control Co.,* 978 F.2d 334, 338, 339 (7th Cir.1992), we proceed as if U.S. Can had purchased the assets of the four plants from Continental Can.

In concluding that U.S. Can assumed the master agreement, including the IPJO, the Board relied principally on U.S. Can's letters of May 14 and subsequent implementation of most terms of the existing pact. This infuriates U.S. Can, which expostulates that it told the union as bluntly as it knew how that it would not assume the master agreement. Two days before the merger, one of Continental's managers sent the Steelworkers' vice president Leon Lynch, whose portfolio includes the container industry, a draft of the acquisition agreement, which stated that U.S. Can was not assuming the master agreement. The letters of May 14 invite local negotiations only and declare that existing terms and conditions are being adopted only pending the conclusion of new collective bargaining agreements. At a meeting with Lynch on May 26, U.S. Can's chief of labor relations distributed 11 pages of the final acquisition agreement, including § 6:03, which provides in part: "The Surviving Corporation does not agree to accept the terms of any master labor agreement. However, the Surviving Corporation shall provide the economic benefit levels presently in effect under the Collective Bargaining Agreements". Indeed, the General Counsel's complaint charges that U.S. Can committed an unfair labor practice by *not* accepting all terms of the master agreement. How is it, U.S. Can asks, that an employer can be found to have "assumed" a contract that it repeatedly told the union it wanted no part of?

Part of the Board's answer is that federal law does not ape all features of the common law of contracts. Labor law contains an obligation to engage in good-faith bargaining, an obligation without counterpart in the law of contracts. The obligation to bargain entails an obligation to retain existing terms and conditions of employment until bargaining has reached an impasse. *Litton Financial Printing Division v. NLRB,* — U.S. —, —, 111 S.Ct. 2215, 2225, 115 L.Ed.2d 177 (1991); *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). An employer taking over a unionized plant cannot set its own terms on a take-it-or-leave-it basis; at a minimum it must hire applicants without discrimination against union sympathizers and bargain with the employees' chosen representative if the union retains a majority. *Burns,* 406 U.S. at 281, 92 S.Ct. at 1579; *U.S. Marine Corp. v. NLRB,* 944 F.2d 1305, 1315 (7th Cir.1991) (in banc). These and other departures from the model of contract may lead to obligations that

employers did not voluntarily assume and strongly prefer to avoid.

A person acquiring a plant or business "is free, as a general rule, to determine the initial terms and conditions of employment." *U.S. Marine*, 944 F.2d at 1315. See also *Burns*, 406 U.S. at 287–88, 92 S.Ct. at 1582. An employer that hires a majority of the old labor force must bargain with any union that represents the workers. *Burns* suggests a further possibility: "there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms." 406 U.S. at 294–95, 92 S.Ct. at 1585–86. This obligation to consult does not necessarily imply that the incoming owner is stuck with the predecessor's terms until bargaining breaks down. See *Spruce Up Corp.*, 209 N.L.R.B. 194 (1974), enforced without opinion, 529 F.2d 516 (4th Cir.1975). Every court that has addressed the subject has held that this passage in *Burns* refers to negotiation and does not establish a substantive obligation to open one's doors offering the predecessor's terms. *Saks & Co. v. NLRB*, 634 F.2d 681, 687–88 (2d Cir.1980); *Nazareth Regional High School v. NLRB*, 549 F.2d 873, 881–82 (2d Cir.1977); *Kallmann v. NLRB*, 640 F.2d 1094, 1102–03 (9th Cir.1981); *NLRB v. Dent*, 534 F.2d 844 (9th Cir.1976); *Machinists v. NLRB*, 595 F.2d 664, 672–76 (D.C.Cir.1978). We sidestepped this question in *U.S. Marine*, see 944 F.2d at 1321–22 n. 22, and need not essay its resolution here, because the Board was entitled to find that U.S. Can did not avail itself of the privilege to set its own terms.

Instead of proclaiming independent terms on which it would hire labor, U.S. Can told each of the local unions that it would adopt "the terms and conditions including wages, benefits and working conditions as they presently exist under the collective bargaining agreement with the Continental Can Company" until new collective bargaining agreements were reached. Elements such as the IPJO are among the "terms and conditions" of employment. Simultaneously U.S. Can was telling the officials of the parent union something different—that it was picking and choosing among terms. An employer could do this. It could say, for example: "we offer all terms and conditions in the odd-numbered clauses of our predecessor's collective bargaining agreement." An employer may select one clause from Column A and two from Column B, treating the old collective bargaining agreement like a menu at a Chinese restaurant, to construct a bona fide unilateral announcement of terms. Formulaic words are unnecessary; an employer need not retype on its own letterhead the clauses it embraces.

But U.S. Can has a problem. To keep union officials happy, it deducted union dues from its employees' checks and remitted the money to the union, as Continental had done, and enforced the union-security clause of the existing agreement. Checkoffs of dues and other payments from the employer to the union, like the enforcement of a union-security clause, depend on the existence of a real *agreement* with the union. 29 U.S.C. § 186(c)(4); *Bethlehem Steel Co.*, 136 N.L.R.B. 1500, 1502 (1962), enforced in relevant part under the name *Marine Workers v. NLRB*, 320 F.2d 615, 619 (3d Cir.1963); *Southwestern Steel & Supply, Inc. v. NLRB*, 806 F.2d 1111, 1114 (D.C.Cir.1986). Cf. *Litton*, — U.S. at —, —, 111 S.Ct. at 2221–22. Otherwise the payment of money is a subvention barred by 29 U.S.C. § 186(a)(2), and the requirement to join the union (or pay dues to it) coerces employees in a way forbidden by 29 U.S.C. § 158(a)(3). Having done things that are lawful only if a collective bargaining agreement is in force, U.S. Can is in a pickle. For neither labor law nor the common law of contracts permits one to riffle through terms, building a "contract" out of the ones you like while discarding the rest. You accept the other party's offer or you decline it; if you strike out a single term, you are making a counteroffer, and unless the other party accepts that counteroffer there is no contract. No one doubts that if U.S. Can was making the

union an offer—the terms of which were "the old agreement minus multi-plant bargaining and the IPJO"—the union curtly refused, and no contract came about. If there was no contract, however, then the checkoffs and union-security provisions were illegal.

The only other option is that U.S. Can, frustrated in its desire to negotiate new terms, assumed the old agreement as an unwelcome burden, but less of a burden than the strike that might have followed cessation of dues payments. Cf. *Burns,* 406 U.S. at 291, 92 S.Ct. at 1584 ("In many cases ... successor employers will find it advantageous not only to recognize and bargain with the Union but also to observe the pre-existing contract rather than to face uncertainty and turmoil."). So the Board found, and substantial evidence supports its decision. Whenever the old agreement worked to its advantage, U.S. Can treated its provisions as binding on the union, not simply as management's unilateral offer. For example, in responding to several grievances U.S. Can invoked the management-rights clause of Continental's agreement, sometimes with language such as: "As specified, in the master agreement, 'management responsibilities' means ...". On other occasions, U.S. Can relied on provisions in the master agreement concerning seniority, contracting out, holidays, overtime pay, and discipline. Contracts work both ways; if some clauses of the master agreement can be enforced against the union, the rest can be enforced against the employer. The administrative law judge found, with considerable justification: "The management officials who answered these grievances evidently regarded the master agreement as the controlling instrument and effectively indicated as much both to the employees involved and to their Union representatives." U.S. Can now dismisses these incidents as loose talk by managers who meant to refer to the master agreement only for information about the content of U.S. Can's unilateral terms. Perhaps so, but we are not trying the case afresh. The Board did not exceed its authority in regarding these many invocations of the master agreement as evidence that U.S. Can treated that agreement as *binding* when convenient to do so. Because contracts bind both parties, the Board's order is

ENFORCED.

CUDAHY, Circuit Judge, concurring in the judgment.

I agree with the majority that this case represents the archetypical stock transfer situation and that U.S. Can would likely be bound to the master labor agreement on that basis had the Board addressed the issue. *See Esmark, Inc. v. NLRB,* 887 F.2d 739, 751 (7th Cir.1989). The fact of the matter is, however, that the Board did not pursue this rather simple theory, but instead followed a complex and questionable analysis to the effect that U.S. Can *adopted* the master labor agreement by its subsequent conduct despite its repeated and vehement statements and actions to the contrary. Because I believe that this novel application of an adoption theory is essentially contrary to important policies of the Act, I would not hold U.S. Can contractually bound under an adoption theory.

The "fundamental premise" of the National Labor Relations Act is "private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract." *H.K. Porter Co. v. NLRB,* 397 U.S. 99, 108, 90 S.Ct. 821, 826, 25 L.Ed.2d 146 (1970); *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 45, 57 S.Ct. 615, 628, 81 L.Ed. 893 (1937) ("The theory of the Act is that free opportunity for negotiation with accredited representatives of employees is likely to promote industrial peace and may bring about the adjustments and agreements which the Act in itself does not attempt to compel."). Each party is free to determine whether the terms of the contract are satisfactory, and negotiation, not compulsion, is the order of the day. 29 U.S.C. § 158(d); *see also* S.Rep. No. 573, 74th Cong., 1st Sess., 12 (1935). Therefore, the general rule is that "although successor employers may be bound to recognize and bargain with the union, they are not bound by the substantive provisions of a

collective-bargaining contract negotiated by their predecessors but not agreed to or assumed by them." *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 284, 92 S.Ct. at 1580 (1972).

The Congressional policy in favor of free bargaining has resulted in a daunting standard to be met if a successor is to be deemed to have adopted or assumed a predecessor's contract: Courts should use the "utmost restraint in applying an adoption theory, [and] absent clear and convincing evidence of consent either actual or constructive," the Board should not contractually bind the successor to the incumbent's terms. *All State Factors*, 205 N.L.R.B. 1122, 1127 (1973). Of course, the Board has held in a number of cases that subsequent conduct implementing numerous terms of a labor agreement is sufficient to support a finding that the successor impliedly adopted the agreement. *See, e.g., Pine Valley Div. of Ethan Allen, Inc.*, 218 N.L.R.B. 208, 219 (1975), *enf'd in part*, 544 F.2d 742 (4th Cir.1976). But when such conduct is coupled with repeated, emphatic and unyielding statements that the successor does not, and will not, adopt the terms of the predecessor's labor agreement, implementation in the interim of some of the predecessor's terms cannot clearly and convincingly establish adoption.

During the acquisition negotiations here, there is overwhelming evidence that U.S. Can steadfastly rejected the predecessor's labor agreement and, in particular, the provision for a multi-plant bargaining unit. The Acquisition Agreement itself contained language unequivocally rejecting the predecessor's labor agreement and stating that U.S. Can planned to bargain on a plant-by-plant basis. The Agreement provided that "[t]he Surviving Corporation does not agree to accept the terms of any master labor agreement." Further, at the May 26, 1987, meeting between U.S. Can and union officials, U.S. Can stated that the company intended to negotiate on a plant-by-plant basis, and when asked whether U.S. Can would adopt the master labor agreement, it responded that it would not. The union representatives certainly understood U.S. Can to be rejecting the master agreement but continued to meet with the company in order to persuade it to adopt the agreement and to convince the company of its asserted obligation to abide by the agreement. U.S. Can continued to reject it. In the light of these expressions of non-adoption, I cannot find clear and convincing evidence that U.S. Can meant to adopt the master agreement merely by following some of its terms. It seems to me that company and union may agree to the substance of various union security and economic terms without there being an implication (as the majority argues) that—in the face of numerous protestations to the contrary—the company has accepted everything.

The case before us illustrates why this is an important matter of policy. Here, U.S. Can implemented all the economic provisions of the predecessor contract. And it continued all the union-security terms. Certainly, these were important concessions—very much in the interest of employees and the union. U.S. Can, however, chose not to accept the multi-plant bargaining unit or the "master" agreement. The majority says in effect that, when an employer accepts 90 percent of an agreement, it will be deemed by adoption to have accepted the other 10 percent. In the future, employers may refuse to accept the 90 percent in hopes of avoiding the 10 percent they do not want. This outcome does not seem to me to advance the public interest.

The majority relies heavily on the fact that U.S. Can implemented the union-security and dues checkoff provisions to find that it adopted its predecessor's agreement. To implement these provisions in the absence of an agreement, it argues, is illegal. Therefore, because there was no offer and acceptance to create an agreement, and because the implementation of the checkoff and other union-security provisions in the absence of an agreement was arguably illegal, "the only other option is that U.S. Can ... assumed the old agreement as an unwelcome burden, but less of a burden than the strike that might have followed cessation of dues payments." *Ante* at 870. What the majority fails to consider, however, is that the "illegality" of a successor's

action in voluntarily assuming its predecessor's union-security terms in the absence of a contract is far from clear. The authority on which the majority relies merely states that an employer is not *required* to implement union-security provisions in the absence of a contract. The cases do not hold that implementing these terms in the interim period following a takeover is illegal. *Litton Fin. Printing Div. v. NLRB,* — U.S. —, —, 111 S.Ct. 2215, 2221–22 (1991) ("... union security and dues check-off provisions are excluded from the unilateral change doctrine because of statutory provisions which permit these *obligations* only when specified by the express terms of a collective-bargaining agreement." (emphasis added)); *Southwestern Steel & Supply v. NLRB,* 806 F.2d 1111, 1113 (D.C.Cir.1986) (same; holding that hiring hall provision is not excepted from unilateral change doctrine); *Indiana & Michigan Elec. Co.,* 284 N.L.R.B. 53, 55 (1987) (noting the exception of permitting unilateral abandonment of union-security and check-off arrangements after contract expiration in holding that arbitration clause is excepted from unilateral change doctrine); *Bethlehem Steel Co.,* 136 N.L.R.B. 1500, 1502 (1962) (holding that company was free of checkoff obligations upon termination of the contract), *enf'd in part sub nom., Industrial Union of Marine & Shipbuilding Workers v. NLRB,* 320 F.2d 615 (3d Cir. 1963), *cert. denied,* 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1964). Indeed, some cases have even held that observing union-security provisions is *not illegal,* and that the continuation of such terms does not indicate that a successor adopted the previous contract. *O'Connor Co. v. Carpenters Union No. 1408,* 702 F.2d 824, 826 (9th Cir.1983) ("The payment of increased wages and fringe benefits and hiring of the carpenters from the Union hiring hall following complete and unequivocal termination of the ... agreement does not indicate consent by the Company to be bound by the new agreement."); *Empire Excavating Co. v. American Arbitration Ass'n,* 693 F.Supp. 1557, 1561 (M.D.Pa.) ("The fact that plaintiff continued to employ union members, make fringe benefit contributions, and check off union dues is clearly not dispositive."), *aff'd,* 866 F.2d 1409 (3d Cir.1988); *General Warehousemen & Employees Union Local No. 636 v. J.C. Penney Co.,* 484 F.Supp. 130, 134 (W.D.Pa.1980) ("Nor are the checkoff of union dues and the settlement of minor grievances in accord with the old contract, alone, sufficient for the court to infer that the parties agreed to extend the old contract in its entirety."); *Food Handlers Local 425 v. Arkansas Poultry Coop.,* 199 F.Supp. 895, 901 (W.D.Ark.1961) ("As for the settlement of the minor grievances and the check off of the union dues, there is no indication that these acts were done in reliance on any existing agreement, but rather were carried on as a routine or customary practice of which there was no compelling reason for either party to alter."), *appeal dismissed,* 306 F.2d 491 (8th Cir.1962); *cf. Burns,* 406 U.S. at 291, 92 S.Ct. at 1584 ("In many cases, of course, successor employers will find it advantageous not only to recognize and bargain with the union but also to observe the pre-existing contract rather than to face uncertainty and turmoil."). This is particularly true in a situation, as here, where the successor intends to hire all of its predecessor's employees, and thus, it is presumed that the union maintains majority support. *Cf. Burns,* 406 U.S. at 295, 92 S.Ct. at 1586.

In any event, the legality of observing these union-security provisions without adopting the master contract is not before us. I think it is inappropriate to play chess with the technicalities of contract formation to drag an employer into a contract which it vociferously rejects. The central reality here is that U.S. Can agreed without reservation to follow many of the terms of the old contract—terms of great benefit to the employees and the union—but it unmistakably refused to accept a few terms. That seems to me to be its right unless *Burns* is a dead letter.

I also write separately to disagree with the majority's characterization of what is required of *Burns* successors that plan to hire all or substantially all of the incumbent employees. In *Burns,* the Supreme

Court held that a successor has the right "to set initial terms on which it will hire the employees of a predecessor." *Id.* at 294, 94 S.Ct. at 1585. But this right was coupled with a duty to bargain with an incumbent union before fixing the initial terms of employment when it is "perfectly clear" that the new employer plans to retain all or substantially all of the predecessor's employees. *Id.* at 294–95, 94 S.Ct. at 1585–86. This means that a successor who hires or plans to hire all or substantially all of the predecessor's employees is bound to the predecessor's terms until bargaining to impasse. This obligation is not contractual but is imposed by federal labor law. *Cf. Litton,* — U.S. at —, 111 S.Ct. at 2225 (explaining the unilateral change doctrine: "[the] terms and conditions continue in effect by operation of the NLRA. They are no longer agreed-upon terms; they are terms imposed by law, at least so far as there is no unilateral right to change them."). One difference between a contractual obligation and a statutory duty is that the former binds the successor to the agreement for the duration of the contract; the latter only until impasse. Once the parties have reached impasse, the statutory obligation to the predecessor's terms is satisfied and the successor can invoke its right to set the initial terms of employment.

The majority indicates that the obligation to bargain to impasse does not entail an obligation "to open one's doors offering the predecessor's terms." *Ante* at 869. It relies on certain cases suggesting that a successor is not bound by the predecessor's terms until bargaining to impasse unless (1) the successor intended to hire all or substantially all of the predecessor's employees, *and* (2) it intended to do so on identical terms. *See generally U.S. Marine Corp. v. NLRB,* 944 F.2d 1305, 1328–29 (7th Cir.1991) (en banc) (Easterbrook, J., dissenting), *cert. denied,* — U.S. —, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992). This formulation makes the successor's obligation to the predecessor's terms dependent upon whether it *intended* to adopt the terms during the interim. This second requirement, however, is plainly inconsistent with the requirements of *Burns.* For *Burns* is properly interpreted to hold that a successor planning to hire all of its predecessor's employees must bargain to impasse *before* it can fix new terms. The intent requirement would imply that a successor may change the terms from those of the predecessor before bargaining to impasse. *Burns* indicates that successors have no such power. Thus, I agree with the majority that a successor planning to hire all or substantially all of the predecessor's employees is not obligated to open its doors on the predecessor's terms—*but,* in the event it wants to begin operating during the interim period before bargaining to impasse, it must do so on the predecessor's terms or on those upon which the company and union have agreed. This is the interpretation of *Burns* which the Board has applied here and elsewhere. It is an approach that balances the important need for the successor employer to be able to set new terms for a "fresh start" while preserving the labor relations framework to which substantially all the employees are accustomed and committed.

Although the majority states that we "sidestepped" this question in *U.S. Marine,* we noted there that, when all or substantially all of the employees are hired by a successor, "the employer [is] obliged to consult with the union before setting new terms." *Id.* at 1321–22 n. 22. Like Judge Will in his concurring opinion, it is extraordinarily difficult for me to distinguish this obligation from a duty to observe the predecessor's terms and to refrain from setting new terms until bargaining to impasse. In the interest of clarity, I prefer the latter formulation and will adhere to it here without attempting definitively to parse *U.S. Marine,* which, of course, came at the question in the context of providing a remedy for other violations.

U.S. Can concedes that it discontinued the Inter–Plant Job Opportunity program (IPJO) without first bargaining to impasse. There is substantial evidence to support the Board's finding that U.S. Can planned to retain all or substantially all of the employees when it unilaterally discontinued IPJO. Therefore, I would enforce that part of the

Board's decision finding an unfair labor practice under § 8(a)(5) even without a finding that U.S. Can failed to exercise the privilege to set its own terms, because I would find that U.S. Can did not have that privilege until it bargained to impasse.

Successors that retain all or substantially all of the predecessor's employees, therefore, must follow the old contract until bargaining to impasse. Successor employers should not, however, against their express wish and in the absence of persuasive evidence, be deemed to have adopted the old contract. To hold otherwise is to create incentives for the obviously undesirable course of *not* hiring the existing workforce. For these reasons, I respectfully concur in the judgment enforcing the Board's order.

WILL, Senior District Judge, concurring.

Judge Easterbrook and Judge Cudahy both arrive at the same destination though by slightly different routes. Both would enforce the Board's order.

I concur with Judge Easterbrook that the Board correctly held U.S. Can's conduct constituted an adoption of the existing master labor agreement notwithstanding its denials that it intended to do so. Actions speak louder than words. Adopting 90% or more of an agreement, including all the provisions favorable to the successor employer, warrants concluding that the agreement has been adopted, oral protestations to the contrary notwithstanding.

I also agree with Judge Easterbrook and Judge Cudahy that, although the Board for some unexplained reason eschewed the obvious ground that because what took place here was a typical stock acquisition-reorganization, U.S. Can should be bound to the master labor agreement on that ground alone.

Since Judge Easterbrook's conclusion that U.S. Can adopted the existing agreement with which I agree is sufficient grounds for ordering enforcement of the Board's order, it is not necessary for us to enter the controversy of whether or not *NLRB v. Burns International Sec. Servs., Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972) warrants the conclusion that a successor employer, while it has a right to set the initial terms and conditions on which it will hire substantially all of the incumbent employees must, nevertheless, bargain in good faith to an impasse with the existing union before imposing the new terms and until it does is bound by the existing agreement.

This is a murky area. *Burns* clearly requires that a successor employer negotiate and bargain with the existing union in good faith when requested to do so. *Burns* at 295, 92 S.Ct. at 1586. It does not state expressly that it must bargain in good faith to an impasse. Nor did the Board so hold here, stating only that U.S. Can's "obligations under *Burns* included not only the duty to recognize and bargain with the union, but also to 'consult with the employees' bargaining representative before [fixing initial] terms' of employment." Board Decision and Order at p. 3 n. 4. The Board also held that U.S. Can had not done so. The ALJ, however, clearly read *Burns* to require that the company continue to operate under the old agreement "until reaching a new agreement or bargaining to impasse." ALJ Decision at p. 26.

I confess that I have difficulty distinguishing between "consulting, negotiating, or bargaining in good faith" and "bargaining in good faith to an impasse." It seems to me that the latter is the best measure of the former, yet a number of courts have made that distinction. *Saks & Co. v. NLRB,* 634 F.2d 681, 687–88 (2d Cir.1980); *Nazareth Regional High School v. NLRB,* 549 F.2d 873, 881–82 (2d Cir.1977); *Kallmann v. NLRB,* 640 F.2d 1094, 1102–03 (9th Cir.1981); *NLRB v. Dent,* 534 F.2d 844 (9th Cir.1976); *Machinists v. NLRB,* 595 F.2d 664, 672–76 (D.C.Cir.1978). Indeed, Judge Easterbrook in his dissent in *U.S. Marine Corp. v. N.L.R.B.,* 944 F.2d 1305, 1328, asserts that *Burns* creates "only a bargaining obligation even if the successor plans to (and does) hire all of its predecessor's employees."

Since I am not perceptive enough to determine if there has been good faith consulting, negotiating, or bargaining before

reaching an impasse and different courts have applied different criteria in determining whether or not the successor employer had discharged its *Burns* duty to negotiate and bargain, I would read *Burns* to require good faith bargaining to an impasse. If a successor employer need simply propose new and changed terms and conditions, and then, if the Union rejects them or makes counterproposals, may put the new terms and conditions into effect, it is obvious to me that this will generate labor strife and strikes which could be avoided by requiring good faith bargaining to an impasse.

I am satisfied, however, in this case, to join in Judge Easterbrook's conclusion that the evidence here clearly establishes that, as the Board found, U.S. Can adopted the existing master agreement and enforcing the Board's order on that ground.